**ASTORIA JEWELRY, et al., Plaintiffs,**

v.

**N. BARQUET, INC. d/b/a Joyerias Barquet, Defendant/Third–Party Plaintiff,**

v.

**Integrand Assurance Co., et al., Third–Party Defendants.**

No. CIV. 01–2403(JP).

United States District Court, D. Puerto Rico.

Oct. 29, 2003.

Harold D. Vicente González, Vicente & Cuebas, San Juan, PR, for Plaintiff.

María E. Rosa Domenech, Francisco A. Rosa Silva, San Juan, PR, for N. Barquet, Inc.

William Reyes Elías, San Juan, PR, for Third–Party Defendant Integrand.

Raúl Dávila Rivera, Bauzá & Dávila, San Juan, PR, for Third–Party Defendant European Underwriters.

### OPINION AND ORDER

PIERAS, Senior District Judge.

## I. INTRODUCTION

Plaintiffs in this case are three jewelry manufacturers and their respective insurers. The Plaintiffs are Astoria Jewelry Manufacturers, and its insurer, Jewelers Mutual Insurance Company, P & S Shah Enterprises, Inc., and its insurer, Art, Inc., and Eclipse Collection, Inc., and its insurer, Kemper National Insurance Co. The Defendant in this case is N. Barquet, Inc., d/b/a Joyerías Barquet. The Third Party Defendants in this case are two insurances companies who issued insurance policies to the Defendant, Integrand Assurance Co. and European Underwriters.

The Court has before it Plaintiffs motion for partial summary judgment (docket No. 69), and Defendant's opposition thereto (docket No. 74), Defendant's motion for partial summary judgment (docket No. 66) and Plaintiffs' opposition thereto (docket No. 73), Third–Party Defendant European Underwriters' motion for summary judgment (docket No. 68), Plaintiffs' response thereto (docket No. 72), and Defendant's opposition thereto (docket No. 75), and Integrand's cross motion for summary judgment (docket No. 49) and Defendant's response thereto (docket No. 53).

The Court also notes that the Court and the parties conducted a visual inspection of Joyerías Barquet on May 12, 2003 (docket No. 61).

The claims in this case arise from the apparent theft or disappearance of jewelry from Defendant's jewelry store, Joyerías Barquet ("Barquet"). On October 23, 2000, Mr. Robert Weinberg, a representative of Plaintiffs, asked the Vice President, Administrative Manager, and Salesperson for Barquet, Mr. N. Barquet, Jr., for permission to leave some bags, which contained jewelry samples, at Defendant N. Barquet's jewelry store located at Fortaleza Street No. 501 in Old San Juan, Puerto Rico. Mr. N. Barquet, Jr. granted Mr. Weinberg's request. The bags were placed in a walk-in vault by Mr. Weinberg, who told Mr. N. Barquet, Jr. that he would pick them up later. On October 24, 2000, Mr. Weinberg came back for his bags; the bags were not in the store. The police were called and Mr. Weinberg filed a complaint with them. Mr. Barquet, Sr., the President of Joyerías Barquet, assisted Mr. Weinberg in translating from English to Spanish when communicating with the police.

Plaintiffs bring the instant complaint alleging that Plaintiffs entered into an oral "depositum contract of bailment" (hereinafter referred to as "depositum contract") with Defendant when they left the bags at the store and that Defendant breached that contract because it was responsible for the loss of the jewels because of the nature of the contract.

Plaintiffs move for summary judgment as to the breach of contract claim, stating that Defendant's employee Natalio Barquet, Jr. executed a voluntary and gratuitous "depositum contract" when he accepted Plaintiffs' jewels (docket No. 69).[1] According to Plaintiffs, he then breached that contract, resulting in the loss of the jewels.

---

1. **bailment. 1.** A delivery of personal property by one person (the *bailor*) to another (the *bailee*) who holds the property for a certain purpose under an express or implied-in-fact contract. Black's Law Dictionary (7th Ed.1999).

Defendant also moves for partial summary judgment as to the breach of contract claim, stating that no "depositum contract" was formed because no intent to form such a contract was manifested by Defendant's employee, Mr. Barquet, Jr. (docket No. 66). According to Defendant, Mr. Barquet, Jr., was only asked to allow or tolerate the use of the store to leave the bags; it was not his intention to take custody and care of the bags and their unknown contents. Therefore, according to Defendant, no "depositum contract" was formed and/or entered into and Defendant is not liable for the ensuing loss.

In addition to the dispute between Plaintiffs and Defendant as to the contract claims in this case, Defendant has brought a third party complaint against two companies who issued insurance policies to Defendant, European Underwriters ("EU") and Integrand Assurance Co. ("Integrand"). Third–Party Defendants European Underwriters and Integrand Assurance Co. have brought motions for summary judgment stating that they are not liable for the losses that occurred. According to EU's motion for summary judgment (docket No. 68), the loss is not covered by the Jewelers' Block Policy issued by EU to Barquet. EU states that the jewels are not covered because they were not part of Barquet's stock, they were not locked, and the cause of their disappearance is unknown.

Integrand also moves for summary judgment (docket No. 69), stating that the loss is not covered under the policy it issued to Barquet.

The Court will first determine whether or not a "depositum contract" was formed and/or entered into and then proceed to evaluate whether the loss is covered by Third–Party Defendants' insurance policies.

## II. FINDINGS OF FACT

These are the uncontested facts agreed to by the parties as they appear in the Court's ISC Order, plus the facts that appear in depositions submitted by the parties which present no controversy of fact.

### A. UNCONTESTED FACTS FROM THE INITIAL SCHEDULING CONFERENCE ORDER

1. Co–Plaintiff Astoria is a corporation engaged in the business of manufacturing fine jewelry items. It is organized under the laws of the state of New York with its principal place of business in Long Island City, Queens, New York.

2. Co–Plaintiff JMIC is an insurance company with its principal place of business in the state of Wisconsin and which, at all relevant times, issued an insurance policy covering risk for Astoria.

3. Co–Plaintiff P & S Shah is a corporation engaged in the business of manufacturing fine jewelry items. It is organized under the laws of the State of California with its principal place of business in Los Angeles, California.

4. Co–Plaintiff Eclipse is a corporation engaged in the business of manufacturing fine jewelry items. It is organized under the laws of the State of Florida with its principal place of business in Wellington, Florida.

5. Co–Plaintiff Kemper Insurance is an insurance company with its principal place of business in the State of New Jersey and which at all relevant times issued an insurance policy covering risk for Eclipse.

6. Defendant N. Barquet is a corporation organized under the laws of the

Commonwealth of Puerto Rico with its principal place of business at 207 Fortaleza Street, Old San Juan, Puerto Rico.

7. Natalio Luis Barquet–Perez is the vice-president, administrative manager and a salesperson for N. Barquet.

8. Natlio Barquet, Sr., is the president of the corporation.

9. Robert Weinberg and Jeffrey Reisman are independent salespersons representing Co–Plaintiffs Astoria, P & S Shah, and Eclipse.

10. On October 23, 2000, Mr. Robert Weinberg asked Mr. N. Barquet, Jr. for permission to leave some bags at Defendant N. Barquet's jewelry store located at Fortaleza Street No. 501 in Old San Juan, Puerto Rico.

11. Mr. N. Barquet, Jr. granted Mr. Weinberg's request.

12. Mr. Weinberg came back to the store with a roller "carry-on" suitcase and an attaché case.

13. The bags were placed in a walk-in vault by Mr. Weinberg, who told Mr. N. Barquet, Jr. that he would pick them up later.

14. On October 24, 2000, Mr. Weinberg came back for his bags accompanied by Mr. Jeff Reisman; the bags were not in the store. The police were called and Mr. Weinberg filed a complaint. Mr. Barquet, Sr., assisted Mr. Weinberg in translating from English to Spanish when communicating with the police.

15. European Underwriters provided N. Barquet with a Jewelers Block Insurance Policy, numbered 200.420/968471.

16. At no time did N. Barquet have any ownership interest in the jewelry which is the subject of this action.

17. At no time did N. Barquet ever enter into a written memorandum or consignment agreement with the Plaintiffs concerning the jewelry which is the subject of this action.

18. At no time did N. Barquet ever enter into any memorandum or consignment agreement with Plaintiffs concerning the jewelry which is the subject of this action.

19. At no time did N. Barquet ever enter into any agreement with the Plaintiffs by which it obtained any legal interest in the jewelry which is the subject of this action.

20. Integrand Assurance Co. issued a Commercial Package Insurance Policy number 04–CP–7022233–9/00 on behalf of insured N. Barquet, Inc., with a policy period from July 1, 1999 to July 1, 2002, with the coverages identified and known as Commercial Property and Commercial General Liability.

21. In its Commercial General Liability coverage form, Section I–Coverages, Coverage A. Bodily Injury and Property Damage Liability, Subsection 2, Exclusions, Exclusion J. Damages to Property, Integrand's policy clearly states that this insurance does not apply to property damage or loss to personal property of others in the care, custody, or control of the insured.

22. In its Causes of Loss—Special Form, Subsection C. Limitations, subparagraph 4 for Limits Shown, Integrand's policy directly sustains that, for loss or damages by theft, the insurer will pay to the insured only up to $2,500.00 for its own jewelry, precious and semiprecious stones, gold and other precious alloys or metals.

23. In its Building and Personal Property coverage form, Section A. Coverage, Subsection 5. Coverage Extensions, subparagraph b. Personal Effects and Property of Others, Integrand's policy consistently states that this insurance coverage may be extended to apply to damage or loss to some personal property of others in the care, custody or control of the insured, but that the most the insurer will pay under such extension is only up to $2,500.00 without any exceptions.

## B. *UNCONTESTED FACTS AS THEY APPEAR IN DEPOSITIONS SUBMITTED BY THE PARTIES*

1. Relevant portions of Deposition of Natalio Barquet, Jr., attached to this opinion as "Exhibit A."

2. Relevant portions of Deposition of Robert Weinberg, attached to this opinion as "Exhibit B."

3. Relevant portions of Deposition of Victor Esquerdo Martínez, attached to this opinion as "Exhibit C."

## III. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides for the entry of summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir.1993); *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 894 (1st Cir.1988). Summary judgment is appropriate where, after drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue of material fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d

202 (1986). · A fact is material if, based on the substantive law at issue, it might affect the outcome ·of the case. *Id.* at 248, 106 S.Ct.·2505; *Mack v. Great Atl. & Pac. Tea Co., Inc.*, 871 F.2d 179, 181 (1st Cir.1989). A material issue is "genuine" if there is sufficient evidence to permit a reasonable trier of fact to resolve the issue in the nonmoving party's favor. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 24 (1st Cir.1989).

The party filing a motion for summary judgment bears the initial burden of proof to show "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmovant to show that "sufficient evidence supporting the claimed factual dispute [exists] to require a jury or judge to resolve the parties' differing versions of truth at trial." *See First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968). The party opposing summary judgment may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through filing of supporting affidavits or otherwise, that there is a genuine issue for trial. *See id.; see also Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir.1993). On issues where the non-movant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion. *See Anderson*, 477 U.S. at 256–57, 106 S.Ct. at 2514–15.

## IV. CONCLUSIONS OF LAW

### A. Whether a "Depositum Contract" Was Formed or Entered Into

#### 1. Introduction and Underlying Facts

Based on witness responses as contained in the relevant portions the parties' deposi-

tions, which are attached to this opinion as Exhibits A, B, and C, the uncontested facts as to what occurred are as follows. Plaintiffs' representative, Robert Weinberg, asked whether he could leave his bags at the store overnight, and Defendant's employee, Natalio Barquet, Jr., agreed. Their accounts of what occurred are substantively identical.

*Mr. Weinberg's Account:* And I said to him, "Listen, as long as I have an appointment here tomorrow morning, may I put my bags away here? That way I don't have to have them with me when I go make these other appointments." He said "fine". Deposition of Robert Weinberg, Exhibit B, p. 37.

*Mr. Barquet's Account:* Mr. Weinberg walked into the store, greeted me as for my family [sic]. I answered, Mr. Weinberg asked me about—ah—after a brief conversation, unless I should be specific, which I show no interest in anything that he might bring, he asked me for permission, if he could leave his bag in my store and come back for it later, which I agreed. Deposition of Natalio Barquet, Jr., Exhibit A, p. 27.

No substantive discussion of the terms and conditions of the agreement took place (*See* Deposition of Robert Weinberg, p. 37–38, deposition of Natalio Barquet, Jr., p. 27–28). Plaintiffs' representative, Robert Weinberg, then placed the bags in Defendant's vault.

*Mr. Weinberg's Account:* And I took my bag ... We went in the back, which is a little circulus room into the back, into the vault. When we got to the vault, he opened the door... He put our bags in. He and I—Natalio and I, put the bags in on the right. He closed the door. I left. Deposition of Robert Weinberg, Exhibit B, p. 38.

*Mr. Barquet's Account:* Mr. Weinberg stepped out for a few minutes ... came back into my store, little later, with a rolling—ah—carry on ... he followed me through the passway, and placed his bag, very—ah—comfortably in the vault, and left. Deposition of Natalio Barquet, Jr., Exhibit A, p. 28.

Over the twenty five years that Defendant has been in the jewelry business, it has been customary practice to allow salespeople that Defendant knows and trusts to leave bags in the vault for safekeeping.

*Mr. Weinberg's Account:*

Q: How long have you been doing business with Barquet, Jr. or Sr.?

A: Well, not junior, but senior, close to 30 years, I guess.

Q: And when you traveled to Puerto Rico, would you regularly leave your bags at his store?

A: It all depends. I could leave it there. I could leave it at Villar. I could leave it—you know. I've left them at Rivera. The trick is not to have the bag with you if you can help yourself. Deposition of Robert Weinberg, Exhibit B, p. 40.

*Mr. Barquet's Account:*

Q: How many years have you been in the jewelry business, as up today?

A: Twenty five years.

Q: Twenty five years? OK. In those twenty five years, I ask you whether is it customary practice in your business to receive a sales person that you know and to grant him permission to leave any bag or any suitcase for overnight safekeeping in the vault.

A: Yes. Deposition of Natalio Barquet, Jr., Exhibit A, p. 23.

It is not customary for Defendant to execute a contract, or any type of release or waiver, with the salesperson regarding the safekeeping of the goods.

Q: OK. And in those twenty years that—that you have—have accepted the—or you have granted permission to leave—to have that sales person leave his or her bags or suitcases for over-night safekeeping in the vault, has it been your practice to have that sales person sign a release or waiver?

A: Never.

Q: Never? OK. And—and I ask you whether is those twenty years you have told that sales person, who is requesting your permission to leave his or her bags or suitcases for overnight safekeeping in the vault, to execute a contract with you concerning the safekeeping—

A: No. Deposition of Natalio Barquet, Jr., Exhibit A, p. 25.

The parties never discussed whether Mr. Barquet, Jr. would safeguard the bags or bear the risk of loss of their contents should anything be missing the following day. (*See* Deposition of Robert Weinberg, Exhibit B, p. 37–38, deposition of Natalio Barquet, Jr., Exhibit A, p. 27–28). In his deposition, Mr. Barquet, Jr., stated that he granted permission to Plaintiffs' representative to leave his bags at his store "as a courtesy" and noted that Mr. Weinberg's family had known his family for many years.

Q: So . . . you never told Mr. Weinberg that he was leaving the roller carry on and the tote bag inside the vault at his own risk? You never verbally told him that, correct?

A: If I can answer this, it is, in our industry, a question of honor. Nobody assumes, but nobody knows. Mr. Weinberg asked for permission because he knows my family, as he has done in previous years.

Q: And—So for what reason did you grant permission for Mr. Weinberg to leave—?

A: As a courtesy, sir. Deposition of Natalio Barquet, Jr., Exhibit A, p. 48.

## 2. Whether Alleged "Depositum Contract" is Governed by Civil Code or Commerce Code

First, the parties disagree as to whether the instant dispute is governed by the Civil Code or the Commerce Code. Defendant has recently adopted the stance that the dispute is governed by the Commerce Code, while Plaintiff asserts that the dispute is governed by the Civil Code. According to the Puerto Rico Commerce Code,

> In order for a deposit may be considered commercial, it is necessary:
>
> (1) That the depositor, at least, be a merchant.
>
> (2) That the wares deposited be commercial objects.
>
> (3) That the deposit constitute in itself a commercial transaction, or be made by reason of commercial transactions. 10 P.R. Laws Ann. § 1622.

█ The Court will not enter into an analysis of the merits of Defendant's theory that the instant dispute is governed by the Commerce Code because the Court finds that Defendant waived the ability to present this theory before the Court. The Court notes that Defendant did not announce this theory until it filed its motion for summary judgment; Defendant did not request leave from the Court to amend the complaint. Defendant did not plead this defense in its answer, nor in any other Court document, nor at any conference before the Court, for two and one half years following the filing of the complaint, bringing it for the first time in its motion for summary judgment filed July 1, 2003.

The presentation of this new legal theory is barred by the dictates of this Court's Initial Scheduling Conference ("ISC") Call

and ISC Order. Defendant never raised this new defense at the Initial Scheduling Conference held by the Court on March 20, 2003, nor did they raise it in their Initial Scheduling Conference Memo, where the parties are ordered to set forth all of their factual and legal contentions. According to this Court's ISC Call, the parties are to come to the conference prepared to "inform the Court of the legal contentions of the parties and their theories of the case, with citations to statutes and case law (*see Ramírez Pomales v. Becton Dickinson & Co.*, 839 F.2d 1, 3–6 (1st Cir.1988))." Nor did Defendant raise the defense at a Further Scheduling Conference held on May 21, 2003. Defendant possessed ample time in which to amend their pleadings or find some other way to alert Plaintiffs as to their new theory but chose not to. Their failure to announce this new legal theory thwarts the ability of the parties to proceed with the disposition of the case in a fair and efficient manner. As stated in this Court's ISC Call,

> This Call and the Court's entire ISC regime extend from the philosophy of our adversarial judicial system as a method for reaching the truth. Under our adversarial system, the truth is often a flexible entity. The lawyers obtain their respective versions of the truth from different sources with different perspectives and different motives. Nevertheless, our judicial system and this Court in particular believes that the search for the truth must be a common enterprise, and in order to obtain the clearest picture of the truth, the attorneys and the Court must understand the positions of each party and the evidence the parties plan to use in support of those positions. When the lawyers and the Court fully comprehend each party's position and evidence, each can make a realistic and comprehensive evaluation of the truth. Only then can the value of each party's position be fairly assessed in terms of litigation costs, jury appeal, potential liability, and collectability of judgment.

In this case, Plaintiffs have not had adequate notice of this theory and a chance to develop evidence and offer arguments to controvert the theory. The Court therefore considers Defendant's contention that the instant interaction was government by the commerce code to have been waived. Therefore, the Court will analyze the alleged "depositum contract" under the Civil Code.

### 3. Whether a "Depositum Contract" was Formed or Entered Into

■ A "depositum contract", both in the Puerto Rico Civil Code and the Spanish Civil Code, applies to situations where one person gives something to another person whom they trust, for safekeeping, until the owner returns to recover the thing. *See Generally* Federico Puig Peña, IV Treatise of Spanish Civil Law, Volume II, Obligations and Contracts, 2nd Edition, p. 490–517 (Editorial Revista de Derecho Privado, Madrid), Jose Ramon Velez Torres, IV Course of Civil Law, Volume II, Contract Law, p. 472–494 (Interamerican University of Puerto Rico, Department of Law, San Juan, Puerto Rico), Jose Maria Manresa y Navarro, XI Commentaries to the Spanish Civil Code, p. 656–719 (Instituto Editorial Reus, Madrid, 1950), Manuel Albaladejo, XXII Commentaries to the Civil Code, Volume 1, Articles 1740–1808 of the Civil Code, p. 163–253 (Editorial Revista de Derecho Privado).

■ According to the Civil Code of Puerto Rico:

> A depositum is constituted from the time a person receives a thing belonging to another with the obligation of keeping

and returning it. 31 P.R. Laws Ann. § 4621.

Depositum is a gratuitous contract unless there is an agreement to the contrary. 31 P.R. Laws Ann. § 4621

A voluntary depositum is that in which delivery is made by the will of the bailor. The depositum may be made by two or more persons who believe themselves to have a right to the thing bailed in the hands of a third person, who shall, in a proper case, deliver said thing to the proper person. 31 P.R. Laws Ann. § 4651.

In addition, the code indicates that a party receiving delivery of a thing is not required to have known the contents of it in order for a "depositum contract" to have been formed and in order for the party to be liable for the loss of the concealed contents.

> When the thing bailed is delivered closed and sealed, the bailee must return it in the same condition, and shall be liable for the losses and damages if the seal or lock should have been broken by his fault. Such bailee is presumed to be to blame unless the contrary is proven. 31 P.R. Laws Ann. § 4664.

The key consideration in a depositum contract is whether the thing has actually been handed over to the depositor; until this act is performed, the contract is not formed. As Ramón Vélez states,

> So, we can say that, with the depositum contract, a person hands over to another trusted person the possession of a thing, with the aim that this person will care for or guard it until the day comes when it is returned to its owner. One notes, immediately, that, unlike other contracts that involve the possession of something with the aim of benefitting from or using the object, in the depositum contract the person who receives the deposit receives the possession of the thing with a differ-

ent aim: to care for it. *See* Ramón Vélez at p. 475.

As Manresa states,

> The deposit is formed from when a person receives the thing in question. Consent alone is not sufficient, though it is an essential foundation, as we have said many times before, of every contractual relationship in modern law, but it is essential to receive the thing, to effect a material handing over of the thing; and if this does not occur, the key legal element is not established; perfection of the contract does not occur. For this reason, in old as well as in modern positive law, the depositum contract has always been considered, as Potheir said, a "Contrato Real" [real contract], and does not exist until the receipt of the object of the deposit occurs ... the handing over of the deposit has, apart from its characteristic significance of perfection of the contract, a specific end, which is the custody of the thing and the restitution of the thing at the stated time to its owner. *See* Manresa at p. 657.

■ The depositum contract is unilateral because, as Manresa states, "the obligations are completely upon the person who receives the deposit, not the person who makes the deposit." *See* Manresa at p. 658.

The Supreme Court of Puerto Rico has created a two part test for determining whether or not a "depositum contract" has been formed between the parties:

> The basic determination to be made in the decision as to whether, in a particular case, a contract of bailment has been executed is whether or not the delivery of the thing has been accomplished, [and] whether the bailee has received the effective possession and control of the thing to the point of excluding the

possession of the owner himself as well as of any other person. *Nicole v. Ponce Yacht Club*, 96 P.R.R. 286, 290 (1968), *citing Rivera v. San Juan Racing Ass'n, Inc.*, 90 P.R.R. 405 (1964).

■ Therefore, the primary questions before the Court are 1) whether a delivery of the bag was accomplished and 2) whether Defendant was in possession and control of the bag. In this case, the delivery was accomplished. As outlined above in the parties deposition testimony, the parties agree that Plaintiffs' representative left a bag with Defendant after Defendant's representative granted his request to leave them there. Second, Defendant had effective possession and control of the bags. The bags were left in Defendant's vault and were in their possession. By accepting the bags and leaving them inside its vault, Defendant implicitly consented to the requirements of a "depositum contract" under the Puerto Rico Civil Code. *Teachers Annuity v. Marital Community*, 115 P.R.R. 372, 387 (1983) ("[T]he determining element of the implied consent is the person's conduct and not the words used to express such consent.")

### 4. Liability for Loss

According to the Puerto Rico Civil Code, A bailee is obliged to keep the thing, and, when required, to return it to the bailor or to his legal representatives, or to the person who may have been designated in the contract. His liability, with regard to the keeping and loss of the thing, shall be governed by the provisions of section 2991–3344 of this title. 31 P.R. Laws Ann. § 4661.

This section of the Puerto Rico Code refers to Article 1057 of the Civil Code which establishes what constitutes fault or negligence of the debtor in these terms:

The fault or negligence of the debtor consists of the omission of the steps which may be required by the character of the obligation, and which may pertain to the circumstances of the persons, time, and place. Should the obligation not state what conduct is to be observed in its fulfillment, that observed by a good father of a family shall be required. 31 P.R. Laws Ann. § 3021.

The commentators use the same language in describing liability. According to Manresa, "the two fundamental obligations of the one who receives the deposit are: guard and care for the thing and return the thing to the person who deposited it when this person or his legal representative asks for it." *See* Manresa at p. 675.

■ Defendant's obligation is inferred from the nature of the obligation and characterized as that of a good father of family. *See American Security Ins. Co. v. Ocasio*, 102 D.P.R. 166, 168 (1974). Manresa describes this obligation as follows,

The person who receives the deposit should employ, as to the things deposited, the same care he would give in guarding his own things. This type of diligence is imposed for two reasons: the first, because it is the required fidelity of this legal relationship, and second, for the presumption that the person making the deposit, upon choosing the person who is to receive the deposit, has carefully considered the level of care he usually has with his own things, to infer the level of care he will have with the thing deposited. *See* Manresa at 676.

One of the consequences of such an obligation is a presumption of loss by fault of the Defendant in this case.

"Whenever the thing should be lost, when in the possession of a debtor, it shall be presumed that the loss occurred by his fault and not by a fortuitous event, unless there is proof to the contrary and without prejudice to the provi-

sions of section 3013 of this title." 31 P.R. Laws Ann. § 3192.

The Supreme Court of Puerto Rico in *P.R. & American Ins. Co. v. Durán Manzanal*, 92 P.R.R. 279 (1965), established the requisites for determining whether an event is a fortuitous event,

(1) That the event or occurrence producing it is not contingent on the will of the person doing the service, or chargeable to the latter it having originated in accident *fatum fatalis;*

(2) that the event be unforeseen or inevitable, in the sense of not being within the scope of the reasonable and customary diligence of the person under obligation;

(3) that the nonperformance presupposes impossibility and not mere difficulty.

This opinion, citing with approval various Spanish commentators, among them Castan, Puig–Pena, and Manresa, made clear that the Spanish Civil Code did not make any distinctions between cases and classification of negligence admitted in the Roman texts, the Law of Partidas, or the French Civil Code. The law imposes on the bailee the standard of care contained in the contract, and, if the contract is silent in this respect, the standard is that of a good father of a family according to the circumstances. This represented great progress, in the opinion of Castan, since it affords the Court flexibility to adapt the concept of liability to each specific instance.

As stated by the Supreme Court of Puerto Rico in *American Security Insurance Co. v. Ocasio*, 102 D.P.R. 166, 169–170, 1974 WL 36891 (1974):

Thus we see that the Code upon using the concept "diligence of a good father of a family" had the purpose of leaving up to the courts to determine, in each particular case, which is the proper diligence which generally should be that which "an average or normal type of diligent person" would have exerted.

The analysis that the Courts have adopted balances the burden of taking precautions against the apparent risk that illegal acts taken by third parties present. *See Prosser*, The Law of Torts, 173–176 (4th Ed.1971) cited with approval in *Estremera v. Inmobiliaria Rac., Inc.*, 109 D.P.R. 852, 858 n. 6, 1980 WL 138530 (1980). It is a difficult task, as difficult as determining when the causal relation is present and what are its limits. For this reason, Castan Tobenas, cited with approval in the *Estremera* case, concludes:

Said theories have only a relative value. In fact, as Ennenccerus himself has said, "the difficulty in knowing up to what point one can take the casual relation can never be resolved by abstract rules in a manner that is completely satisfactory, more so, in case of doubt it should be resolved by the judge based on his convictions and after pondering all circumstances." Castan–Tobenas, *Derecho Civil Espanol*, 195 (10th ed.1962) cited in *Estremera*, 109 D.P.R. at 859.

■ Taking into account the particular circumstances of the time, place, and people involved in the instant case, the Court finds that the Defendant had a reasonable basis to believe that the security measures it employed were insufficient to protect the objects entrusted to them. There is a direct causal relationship between the possible measures that Defendant could have taken and the prevention of theft or disappearance. In a comparable case, *Travelers Indem. Co. v. S. Klein of Puerto Rico*, 676 F.Supp. 32 (D.P.R.1987), Plaintiffs sued Defendants where Plaintiffs had sent garments to Defendants premises to be assembled. Burglars broke into the Defendants' premises and stole the garments, and Plaintiff sued, alleging a breach of a

"depositum contract." The Court held that the depository violated his obligation to care for deposited garments with the diligence of a good "father of a family" and was liable to the depositor even where the products were stolen because the depository had reason to know that the security measures he adopted were insufficient. The Court finds that a similar situation exists in the instant case.

Defendant did not employ the diligence of a good father of the family in the instant case. First, Defendant's employee Natalio Barquet, Jr., admits that the vault was left open all day.

> As a matter of record, the vault doors are open in the morning, and they remain open all day, until they're locked at closing time. Deposition of Natalio Barquet Jr., Exhibit A, at p. 29.

Second, one of Defendant's salespeople, Victor Esquerdo, admitted that he did not feel any duty or responsibility to protect goods left in the care of the store.

> Q: Once . . . you decide . . . to permit [another person who left bags in the vault at a different time] to leave his bags inside the vault . . . do you feel . . . you have any obligation to safekeep the bags that were left inside the vault [while the other person who left bags in the vault at a different time] is outside the store?
>
> A: No.
>
> Q: OK.
>
> A: No. He's the one leaving it. I'm giving him permission. I'm doing him a favor, so that makes him responsible. Deposition of Víctor Esquerdo Martínez, Exhibit C, at p. 27.

Third, Defendant's employee, Natalio Barquet, Jr., admits that the security cameras installed in the store merely display scenes from the store without recording anything.

> A: In the day time, we have surveillance cameras.
>
> Q: OK. Are these surveillance cameras part of [the alarm system]?
>
> A: No.
>
> . . .
>
> Q: Is there any reason why the corporation decided to install non-recording surveillance cameras?
>
> A: No reason in particular. *See* Deposition of Natalio Barquet, Jr., Exhibit A, p. 13

Defendant did not hire security personnel to watch the screens; rather, according to Defendant's employee, Natalio Luis Barquet, Jr., the salespeople were to observe the monitors as part of their duties.

> Q: OK. So these monitors, is there a person employed by the corporation who is constantly seeing the monitor, or— or is—ah—the same sales persons that are seeing the monitors?
>
> A: The same sales persons.
>
> Q: As of today, how many employees or sales persons . . . how many employees do you have today working at the corporation, at the 201 Fortaleza Street store?
>
> A: Seven. *See id.* at p. 15.

It is common sense that salespeople have other duties and cannot be expected to vigilantly attend to the surveillance cameras all day. One of Defendant's salespeople, Mr. Víctor Esquerdo Martínez, stated that he did not feel any obligation to protect the bags that were left inside the vault when a salesperson left the store (*See,* as quoted above, Deposition of Víctor Esquerdo Martínez, Exhibit C, at p. 27). In his deposition he stated, "No. He's the one leaving it. I'm giving him permission. I'm doing him a favor, so that makes him responsible." (*See id.* at p. 27.) Finally, Defendant admits that it regularly accepted bags for storage, indicating that it could

have foreseen, based on the regularity of the practice, the need to take security measures. As stated in the deposition of Natalio Barquet, Jr.,

> Q: How many years have you been in the jewelry business, as up today?
> A: Twenty five years.
> Q: Twenty five years? OK. In those twenty five years, I ask you whether is it customary practice in your business to receive a sales person that you know and to grant him permission to leave any bag or any suitcase for overnight safekeeping in the vault.
> A: Yes. Deposition of Natalio Barquet, Jr., Exhibit A, p. 23.

At night, Defendant does employ strict security measures, including placing all the merchandise in a vault with a timed lock, locking the doors with gates, and arming an alarm system. As stated in the deposition of Natalio Barquet, Jr.,

> Q: So you mentioned the alarm system, by Wackenbut Corporation, time locks in the vault. Is there any other measure that the corporation has taken ... security measures the corporation has taken to prevent ... burglaries or robberies in the store?
> A: Well, we have ... in the evening, the doors are locked with gates, and that's all the security we have. In the day time, we have surveillance cameras. Deposition of Natalio Barquet, Jr., Exhibit A, at p. 12–13.

The failure of Defendant to adopt security measures, such as locking, or even merely closing, the vault, during the day, using recording security cameras, and employing security personnel to watch the security cameras, bears a direct causal relationship to the disappearance of the merchandise. Defendant did not demonstrate the care of a diligent father of the family under the circumstances. Therefore, the Court finds that Defendant is liable for the loss of the merchandise Plaintiffs stored with them and **GRANTS** Plaintiffs' motion for summary judgment as to Plaintiffs' claim for breach of contract (docket No. 69).

### B. Are The Third Party Defendant Insurance Companies Liable for Coverage of Loss?

#### 1. Integrand Assurance Co.

■ According to Integrand, in its motion for summary judgment (docket No. 49), the insurance policy it issued to Defendant does not cover the instant loss. Integrand issued a Commercial Policy to Defendants which contains two coverage parts 1) Commercial Property and 2) Commercial General Liability. The relevant section as to liability is as follows:

> The liability insurance coverage does not apply to property damages or loss to personal property of others in the care, custody, or control of the insured. Commercial General Liability Coverage Form, Section 1–Coverages, Coverage A. Bodily Injury and Property Damages Liability, Subsection 2. Exclusions, Exclusion J(4). Damages to Property.

According to Integrand, the above segment of their policy with Defendant is applicable to the instant case because Defendant is being sued for damages, therefore the application of the comprehensive general liability policy is appropriate. The introduction to this section of the policy states that "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." As stated above, the policy does not apply to property damages to personal property in the care, custody or control of the insured. The Court has already determined in the preceding section that the property was under the care, custody, and control of Defendant

because a "depositum contract" was formed. Therefore, the Court finds that Integrand's insurance policy issued to Defendant does not cover the instant loss. Accordingly, the Court **GRANTS** Third-Party Defendant Integrand Assurance Company's motion for summary judgment (docket No. 49) and **DISMISSES WITH PREJUDICE** Defendant's third-party claim against Integrand.

## 2. European Underwriters

The jewelry that disappeared in this case was covered by "jewelers block policies," insurance policies issued to Defendant Joyerías Barquet by European Underwriters ("EU"). Jewelers block insurance is a form of property insurance created by Lloyds of London at the turn of the century to afford coverage of a jeweler's stock against all risks and perils, subject to certain exceptions. European Underwriters now moves for summary judgment on three grounds. First, EU states that the lost jewelry was not covered under the jewelers block policy because the policy only covers Barquet's stock, and the jewelry never became part of that stock. In addition, even if the jewelry did become part of Barquet's stock, and therefore subject to coverage, any claim arising from the loss would be barred due to Barquet's breach of a policy condition requiring all stock to be kept in locked showcases or safes during regular business hours. Finally, any claim would additionally be excluded under the unexplained shortage and mysterious disappearance exclusion contained in the policy, because there is no explanation as to how the merchandise disappeared.

■ Section 1 of the "Schedule of Insurance" for Barquet's policy states that the policy affords coverage to Barquet for up to $1,000,000.00 "on stock (including other

people's goods)." As set forth in section 2 of the Schedule of Insurance, Limitations of Liability, and in the Special Conditions of Coverage, this $1,000,000 coverage applies only to the insured's stock while the premises are closed and the stock is kept in a locked vault. For losses of the insured's stock which occur while the premises are open to the public, the maximum liability of EU is $250,000.00. In either event coverage is only afforded to the insured's *stock*, including the insured's stock which includes other people's goods. According to EU, A jeweler's stock is the merchandise which he holds for sale, or his inventory. Therefore, "Jeweler's stock" would not include other people's goods that the jeweler possesses yet are not for sale.

It is not clear from the language of the insurance policy alone whether goods received per a "depositum contract," as in this case, constitute "stock (including other people's goods)". However, the application for insurance definitively resolves this dispute. As part of the application for insurance, Barquet was required to fill out a detailed proposal form. Included in that proposal were questions concerning the amount of insurance he desired for his stock. The proposal also requested information concerning the most recent inventory of stock, including "other people's property in your custody and control." The proposal specifically noted that the stock inventory should not include "property of others in the jewelry trade deposited with the insured for safe custody only." The application for insurance clearly put Barquet on notice that jewelry accepted under a "depositum contract" for safekeeping, as the Court has determined occurred in this case, did not form part of his insured stock. While the Court finds that this is sufficient grounds to grant EU's motion for summary judgment, it will ad-

dress further arguments supporting EU's motion for the sake of clarity.

EU also alleges that coverage for the lost jewels is barred due to Barquet's breach of a policy warranty. The jewelers' block policy issued to Joyerías Barquet contains the following warranty:

Locked Showcase Warranty—Applicable to theft from the showcases, safes, cupboards and areas or display windows. It is a condition precedent to all liability of Underwriters, in respect of loss by theft, that whilst the premises are open for business, all showcases, safes, and cupboards containing Stock, and the rear of all display windows be locked and keys removed therefrom, other than during the process of items being added or removed by a responsible authorized person.

According to EU, the purpose of this warranty is to guarantee that, while open to the public, Barquet should take the rudimentary precaution of keeping his stock locked up. The warranty is intended to protect EU by reducing or eliminating the risk that the goods they have insured will be stolen during business hours.

■ Therefore, even assuming that, in some way, the jewels constituted "stock" covered under the policy, the facts indicate that the loss of the jewels occurred by reason of breach of the Locked Showcase Warranty. The parties do not contest that the bags were placed in an unlocked, open vault. This clear violation of the locked showcase warranty would bar any claim arising from the disappearance of the bags.

■ Finally, EU claims that loss is barred from coverage as a "Mysterious disappearance or unexplained shortage." Paragraph 20 of the Exclusions section of Barquet's policy bars from coverage "Loss resulting from stock taking losses, unex-plained shortages and mysterious disappearance." Nearly three years after the disappearance of the jewels, there has been no explanation as to how the two bags could simply disappear from the vault. Therefore, coverage is additionally barred by this section of the policy.

Therefore, the Court finds that coverage of the instant loss is clearly barred under the Jewelers Block Policy issued by European Underwriters to Joyerías Barquet and **GRANTS** European Underwriters' motion for summary judgment (docket No. 68) and **DISMISSES WITH PREJUDICE** Defendant's third-party claim against European Underwriters.

### C. Determination of Value of Jewels' Lost

While the Court has determined that Defendant is liable for the value of the lost jewels, there exists a dispute as to how the sum of the loss Plaintiffs' incurred is to be calculated. Therefore, the parties **SHALL** appear on the date scheduled for trial in this case, **November 21, 2003. On or before November 10, 2003,** the Plaintiffs and Defendant **SHALL** submit briefs on this issue accompanied by documentary evidence and any expert analysis stating their positions as to the value of the lost jewels. Should the parties wish to present expert testimony regarding their damages, said expert **SHALL** file with the Court his or her expert report, containing his or her curriculum vitae, pursuant to Fed.R.Civ.P. 26 and the requirements for this purpose contained in this Court's ISC Call and ISC Order. The parties **SHALL** file the aforementioned information with the Court, and tender a copy, through personal service or via certified mail, to the other party, **on or before November 10, 2003.** Finally, the parties **SHALL** inform the Court, **on or before November 10, 2003,** if they will

need an interpreter during the damages hearing.

## V. CONCLUSION

The Court **GRANTS** Plaintiffs' motion for partial summary judgment (docket No. 69) and **HOLDS** that Defendant N. Barquet, Inc., d/b/a Joyerias Barquet is liable for the loss of the jewelry in this case. The Court **GRANTS** Third Party Defendants' European Underwriter's (docket No. 68) and Integrand Assurance Co.'s (docket No. 49) motions for summary judgment and **DISMISSES WITH PREJUDICE** Defendant and Third Party Plaintiff N. Barquet's claim against them. However, as the value of the lost jewels is currently in dispute, the parties SHALL appear on the date previously scheduled for trial in this case, **November 21, 2003,** for a bench trial on this issue.

**IT IS SO ORDERED.**

## EXHIBIT A

### NATALIO LUIS BARQUET–PEREZ

taken on May 21, 2003, at Law Offices Bauzá & Dávila, located at 63 Fortaleza Street, Old San Juan, Puerto Rico.

\* \* \* \* \* \*

MR. ROSA–SILVA: Yes.

MR. HUGEL: —— jewelers block policy. Can we—— can we agree on that?

MR. ROSA–SILVA: "Sí", I suppose that——

MR. HUGEL: This should not——

MR. ROSA–SILVA: —— everybody would——

MR. HUGEL: —— this should not——

MR. ROSA–SILVA: —— agree on that.

MR. HUGEL: —— be made public.

MR. ABESADA–AGÜET: No, I have no problem with that.

MR. ROSA–SILVA: "Sí."

MR. ABESADA–AGÜET: Of course.

MR. ROSA–SILVA: At least, this part of the transcript should be sealed. I don't know whether you can do that.

MR. ABESADA–AGÜET: Well, we'll—— we'll find a way——

MR. ROSA–SILVA: "Sí."

MR. ABESADA–AGÜET: —— to resolve——

MR. ROSA–SILVA: If not, we have to—— to seal the whole transcript.

BY MR. ABESADA–AGÜET:

Q So you mentioned the alarm system, by Wackenhut Corporation, time locks in the vault. Is there any other measure that the corporation has taken—— ah—— security measures the corporation has taken to prevent—— ah—— burglaries or robberies in the store?

A Well, we have—— eh—— in the evening, the doors are locked with gates, and that's all the security we have. In the day time, we have surveillance cameras.

Q OK. Are these surveillance cameras part of the system installed by Wackenhut——

A No.

Q —— or it's another company?

A Personally installed. Non recording surveillance cameras.

Q Is there any reason why the corporation decided to install non recording surveillance cameras?

A No reason in particular.

Q OK. And so the monitors were——? Were are the monitors that are connected to the surveillance cameras, where you can see what's happening in the store? Where are they located?

A One by the cashier, on Barquet II, one by the desk in Barquet I, and one in a computer space in Barquet II.

Q When you refer to computer space, could you be more— give us the details—?

A In Barquet II,— ah— as you pass the cashier, there are two steps to the right, and there's a computer space there,——

Q And the cashier is in Barquet II?

A Yes, sir.

Q OK. So these monitors, is there a person employed by the corporation who is constantly seeing the monitor, or— or is— ah— the same sales persons that are seeing the monitor?

A The same sales persons.

Q As of today, how many employees or sales persons—? Strike that. How many employees in total do you have today working at the corporation, at the 201 Fortaleza Street store?

A Seven.

Q Seven. Do you recall their names?

A Of course. Víctor Esquerdo——

MR. ROSA–SILVA: He hasn't asked it. He just asked whether you recall——

THE DEPONENT: Sorry.

MR. ABESADA–AGÜET: I guess your attorney has told you to— to answer the question——

MR. ROSA–SILVA: Just the question.

MR. ABESADA–AGÜET: —— that is——

MR. ROSA–SILVA: I wasn't——

BY MR. ABESADA–AGÜET:

Q OK. So I guess you recall the names. Can you mention the names?

A Yes.

Q You said Víctor Esquerdo. What is his position and—

MR. HUGEL: Well, I—— I object to the form also. You're asking for his opinion on the practice in the jewelry industry and I don't know if he is qualified to testify as to that. You can ask of his own practice.

MR. ABESADA–AGÜET: Well, I'll rephrase, since we stipulated that we're going to object to the form of the question, and I guess, I can make— and I can make leading questions here, right? So— ah— I'll rephrase the question, to have the record clean.

Q How many years have you been in the jewelry business, as up today?

A Twenty five years.

Q Twenty five years? OK. In those twenty five years, I ask you whether is it customary practice in your business to receive a sales person that you know and to grant him permission to leave any bag or any suitcase for overnight safekeeping in the vault.

A Yes.

Q I ask you whether——

MR. ROSA–SILVA: Excuse me, our stipulation is to the fact that we will not—— we waive all objections, except as to form and privilege, which is— which is contemplated in the rule.

MR. ABESADA–AGÜET: Yes, you're right, but the fact that you make——

MR. ABESADA–AGÜET: Well, ——

MR. ROSA–SILVA: It's extremely leading question.

BY MR. ABESADA–AGÜET:

Q OK. And in those twenty years that— that you have— have accepted the— or you have granted permission to leave— to have that sales person leave his or her bags or suitcases for overnight safekeeping in the vault, has it been your

practice to have that sales person sign a release or a waiver?

A Never.

Q Never? OK. And—— and I ask you whether in those twenty years you have told that sales person, who is requesting you permission to leave his or her bags or suitcases for overnight safekeeping in the vault, to execute a contract with you concerning the safekeeping——

A No.

Q —— of the merchandise?

A —— (no audible answer).

Q Is it your customary practice,—— ah—— in those twenty years, to inform the sales person, who is requesting you permission to leave the bags for overnight safekeeping in the vault, to tell that person that, "I'm allowing you——"?

MR. ROSA–SILVA: You have two questions there. One is—— ah—— asking permission, and other is he's asking permission to leave them for safekeeping in the vault. Those

A Very much so.

Q OK. OK. And what—— what——? Do you have any other requirement?

A I don't have any requirements at all.

Q OK. At least, no written requirements, correct?

A As I said before, no.

Q And in the case of—— In this particular case if—— let's—— let's say that—— that we're on trial and you're going to testify as a witness, and I ask you to tell me what happened on October 23rd, 2000, when you met Robert Weinberg, what would you tell me?

MR. HUGEL: Object to the form.

BY MR. ABESADA–AGÜET:

Q You can answer.

A Can I answer?

Q Yes.

A Mr. Weinberg walked into the store, greeted me as for my family, I answered, Mr. Weinberg asked me about—— ah—— after a brief conversation, unless I should be specific, which I show no interest in anything that he might bring, he asked me for permission, if he could leave his bag in my store and come back for it later, which I agreed. Mr. Weinberg stepped out for a few minutes, I cannot really recall the time span, came back into my store, little later, with a rolling—— ah—— carry on, one of those that fit overhead in the compartment in the planes, and a tote bag.

He himself suggested putting it in Barquet I, which he followed me through the passway, and placed his bag, very—— ah—— comfortably in the vault, and left.

Q Did you ever help him or—— or—— or got the opportunity to grab one of the bags that he had or not?

A Mr. Weinberg, as I said before, appeared into Barquet II with the rolling bag and the tote case. He knows the premises. He asked for permission. He rolled the suitcase right behind me.

Q So you cannot ascertain whether the bag was heavy or not, correct?

A At all.

Q OK.

A It's a rolling bag. It's not a carry bag.

Q And do you recall the time when Mr. Weinberg—— ah—— left—— ah—— the bags in the vault?

A Early afternoon.

Q Between two and three?

A Between two and three o'clock.

Q OK. And after Mr. Weinberg left the bags in the vault, were you next to him? Where were you at the time he left the——

A As I said——

Q —— bags in the vault?

A —— before, I lead him to—through the passway to Barquet I, where he placed his rolling bag and the tote bag, he pick—— he walked by—— back—I'm sorry—to Barquet II, we said good-bye, probably would be back later, and he took off. Nothing——

Q OK.

A —— more.

Q I—— I just want to—— to try to—— ah—— understand whether at the time Mr. Weinberg placed the bags in the vault, if you were next to him or you were still in Barquet II.

A As I mentioned before, I led Mr. Weinberg through the passway——

Q OK.

A ——to Barquet I, after he asked——

Q OK.

A ——for permission.

Q OK. And did you——? Was the door of the vault——? Did it remain open or was it closed?

A As a matter of record, the vault doors are open in the morning, and they remain open all day, until they're locked at closing time.

Q So—— Just to understand when you referred to the—— when you used the word "open", you mean that—— ah——?

A Just that.

Q That the door was——

bag.

BY MR. ABESADA–AGÜET:

Q So—— so—— ah—— I ask you,—— ah—— you—— you never told Mr. Weinberg that he was leaving the roller carry on and the tote bag inside the vault at his own risk? You never verbally told him that, correct?

A If I can answer this, it is, in our industry, a question of honor. Nobody assumes, but nobody knows. Mr. Weinberg asked for permission because he knows my family, as he has done in previous years.

Q And—— So for what reason do you grant permission for Mr. Weinberg to leave——?

A As a courtesy, sir.

Q OK. And do you——? So you feel you have no—— ah—— responsibility of—— of taking care——

A I was very much——

MR. HUGEL: Let him—— let him——

MR. ROSA–SILVA: I believe that has been answered repeatedly.

MR. HUGEL: He didn't finish the question.

THE DEPONENT: OK.

BY MR. ABESADA–AGÜET:

Q So—— so—— so—— ah—— it is your understanding that you have no type of, at least, moral obligation or responsibility——

EXHIBIT B

EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
-------------------------------x
ASTORIA JEWELRY MANUFACTURING COMPANY, INC and its
insurer JEWELERS MUTUAL INSURANCE COMPANY, F & S SHAH
ENTERPRISES, INC. and its insurer ART, INC.; ECLIPSE
COLLECTION, INC.; and its insurer KEMPER NATIONAL
INSURANCE COMPANY,
 INDEX NO
 Plaintiffs, 01-2403(JP)

 - against -

N. BARQUET, INC. D B A JOYERIAS BARQUET; ABC INSURANCE
COMPANY; JOHN DOE,
 Defendants and Third-Party Plaintiff the first,
 - against -
INTEGRAND ASSURANCE COMPANY; INTERNATIONAL JEWELERS
UNDERWRITERS AGENCY LTD; EUROPEAN UNDERWRITERS; MARSH
S.A.; DOE INS. CO.,
 Third-Party Defendants.
-------------------------------x
 Clayman & Rosenberg, ESQS
 60 East 42nd Street
 New York, New York
 April 29, 2003
 1:30 p.m.

DEPOSITION of ROBERT WEINBERG, a Nonparty
Witness herein, taken by the Defendants, before a
Notary Public for and within the State of New York.

ALL-STAR REPORTERS, INC. (800)329-9222

---

**Page 2**

APPEARANCES:

VICENTE & CUEBAS, ESQS.
 Attorneys for the Plaintiffs
 Capital Center Building I - PHI
 239 Arterial Hostos, Suite 1201
 Hato Rey, Puerto Rico 00918

By: MELVIN P. MEYER, ESQ.

ROSA-SILVA, ROSA-DOMENECH & HERNANDEZ-LOPEZ DE
VICTORIA, PSC
 Attorneys for the Defendants and Third-Party
Plaintiff N. BARQUET, INC. D/B.A JOYERIAS BARQUET
 1225 Ponce de Leon Avenue, Suite 1500
 San Juan, Puerto Rico 00907
 (787)977-7210
By: FRANCISCO A ROSA-SILVA, ESQ.

CLAYMAN & ROSENBERG, ESQS.
 Attorneys for the Third-Party Defendants
 EUROPEAN UNDERWRITERS
 60 East 42nd Street
 New York, New York

By: PAUL S. HUGEL, ESQ.

ALL-STAR REPORTERS, INC. (800)329-9222

---

**Page 3**

ROBERT WEINBERG, after having been first sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY
MR. HUGEL:

Q Please state your full name for the record.

A Robert Weinberg.

Q Please state your address for the record.

A 278 Parkside Drive, Suffolk, New York.

Q Good morning, Mr. Weinberg. My name is Paul Hugel. I represent the underwriters of the jeweler's block policy for N. Barquet Jewelers. I'll be asking you some questions today and ask that your answers all be oral.

The court reporter will be taken down your responses verbatim, and he can't take down gestures or head nods. If you don't understand any of my questions, please let me know. If you'd

---

**Page 4**

R. Weinberg

like to take a break or would like a drink or anything, just tell me.

Can I get your date of birth, please?

A 10/31/35.

Q And your Social Security?

A What does that have to do with anything?

Q So I know who you are.

A You know who I am.

Q Sir, can I have your Social Security number?

A No.

Q How long have you resided at the address which you gave to the court reporter?

A Two years.

Q And prior to that address, where did you live?

A 23 Amsterdam Avenue, Wesley Hills, New York.

Q How long did you reside at that address?

A Twenty-eight years.

Page 37

R. Weinberg

Americas, which is on the Ottorey, which is on the other side -- not the other side, but it's outside of San Juan.

And I said to him, "Listen, as long as I have an appointment here tomorrow morning, may I put my bags away here? That way I don't have to have them with me when I go make these other appointments."

He said "fine."

I went out to get Jeff. Jeff was double-parked in front of the store called La Tran, which is right on the corner. And there is a pump there.

That's why he wasn't actually double-parked. He was parked at a pump.

Q Illegally?

A Illegally, right.

And Jeff started coming with me with his bag, and I had my bag.

Natalio said, "Stay near the car, otherwise you'll get a ticket." And he took Jeff's back. And I took my bag.

Page 38

R. Weinberg

We went in the back, which is a little circulus room into the back, into the vault.

When we got to the vault, he opened the door. There was a plastic something, like a hamper on the right-hand side.

He moved that over to the left-hand side. He put our bags in. He and I -- Natalio and I, put the bags in on the right. He closed the door. I left.

Then we went to Ottorey, we got lost, and it was a whole production number, but that's neither here nor there.

Q Did you tell Barquet, Jr. that one of the bags was your nephew's? Did he know that?

A He took it from my nephew.

Q Did this take place outside the store?

A Three feet into the store.

Q Other than the discussions

Page 39

R. Weinberg

that you just told, you just related, were there any other conversations with Barquet, Jr. that took place at this time?

A Not really.

Q Other than asking -- you asked him if you could leave your bags and your nephew's bag at the store?

A Correct.

Q Was there any discussion about that he would safeguard them or he would bear the risk of loss if there was anything missing?

A We never discussed that.

Q Is that consistent with your experience with other jewelers when you travel, that there is no discussion of that?

A Never a discussion of that.

By the way, this is not the first time I've left my bag there. So over a 30-year period, I left it there many, many times.

Q Okay. And I guess I will go

Page 40

R. Weinberg

into that.

How long have you been doing business with Barquet, Jr. or Sr.?

A Well, not junior, but senior close to 30 years, I guess.

Q And when you traveled to Puerto Rico, would you regularly leave your bags at his store?

A It all depends. I could leave it there. I could leave it at Villar. I could leave it -- you know. I've left them at Rivera. The trick is not to have the bag with you if you can help yourself.

Q And how long had your nephew been traveling with you to Puerto Rico?

A A couple of years, I guess.

Q And on those occasions when your nephew was with you and you left your bag at Barquet's store, would your nephew leave his bag there, too?

A Generally, yeah. If we leave one, we'd leave two.

Q You always leave them in the

**38**

EXHIBIT C

## VICTOR ESQUERDO MARTINEZ

taken on May 21, 2003, at Law Offices Bauzá & Dávila, located at 63 Fortaleza Street, Old San Juan, Puerto Rico.

\* \* \* \* \* \*

A No.

Q OK.

A No. He's the one leaving it. I'm giving him permission. I'm doing him a favor, so that makes him responsible.

Q OK.

A Do you see what I mean? That's all.

Q OK., and—— and is it usual that you tell the—— ah—— sales person that—— that you know that—— ah—— that is leaving the bag in the vault—— is it normal that you—— ah—— tell that person, "It's your responsibility if you leave the bags in the—— inside the vault, you assume the risk"?

A No.

Q OK. So—— so—— when you left—— when Mr. Treggerman left his bags inside the vault,—— ah—— I think you testified that you saw other bags——

A Yes.

Q ——inside the vault.

A Yes, sir.

Q OK., at the time that you saw the bags—— ah—— inside the vault, the other two bags inside the vault, do you—— ah—— did—— did you know who's bags were they?

A Not at all.

Q OK. At—— at the time that you were with Mr. Treggerman, was Mr. Barquet—— ah—— in the store? Mr. Barquet