# United States Court of Appeals
## For the First Circuit

No. 04-1925

JEWELERS MUTUAL INSURANCE COMPANY; P&S SHAH ENTERPRISES, INC.;
ART, INC.; KEMPER NATIONAL INSURANCE CO.,

Plaintiffs, Appellees,

ASTORIA MANUFACTURING COMPANY, INC.; ECLIPSE COLLECTION, INC.,

Plaintiffs,

v.

N. BARQUET, INC. d/b/a JOYERÍAS BARQUET,

Defendant, Third-Party Plaintiff, Appellant,

v.

INTEGRAND ASSURANCE COMPANY; EUROPEAN UNDERWRITERS AGENCY LTD.,

Third-Party Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jaime Pieras, Jr., Senior U.S. District Judge]

Before

Lynch, Lipez, and Howard, Circuit Judges.

Francisco A. Rosa Silva, with whom Rosa Silva & Rosa Doménech,
PSC, was on brief, for defendant, third-party plaintiff, appellant
N. Barquet, Inc.
Roberto Abesada-Agüet, with whom Harold D. Vicente and Vicente
& Cuebas were on brief, for plaintiffs, appellees Jewelers Mutual
Insurance Co. et al.
William Reyes-Elias, with whom Reyes-Elias Law Office was on

brief, for third-party defendant, appellee, Integrand Assurance Company.

Paul S. Hugel, with whom Clayman & Rosenberg was on brief, for third-party defendant, appellee European Underwriters Agency Ltd.

_____

May 25, 2005

_____

**LYNCH**, <u>Circuit Judge</u>.  In this Puerto Rico diversity action we are asked to apply a civil law concept, the "depositum contract," which has some similarities with, but is not identical to, common law bailment.  The depositum contract is an arrangement where one party delivers items to another for the purpose of temporarily holding and preserving those items.  Under the Puerto Rico Civil Code, the depositary is presumed to perform its duties for no compensation.  31 P.R. Laws Ann. § 4641.

Two traveling jewelry salesmen asked for and were granted permission to leave two bags of jewelry, worth several hundred thousand dollars, at a vault in defendant's jewelry store in Old San Juan.  The defendant, Natalio Barquet, Inc. ("Barquet"), left the vault open during the day and when the salesmen returned the next morning, their jewelry bags were gone.  The owners of the lost wares sued Barquet.  The district court granted summary judgment for the plaintiffs, holding as matter of law that a depositum contract was formed and that the defendant breached its obligations under the contract.

We affirm.  The district court correctly held that a depositum contract was formed: the goods were delivered by the salesmen and willingly accepted into the custody and control of the defendant, which by its actions impliedly consented to take on the obligations of a depositary.  Moreover, no reasonable jury could find that the defendant met its statutory standard of care under a

depositum contract. Finally, we affirm summary judgment against Barquet on its third-party claims that one of its insurers had a duty to defend it in this litigation, and that another has a duty to indemnify it for its liability for breach of the depositum contract.

**I.**

A. <u>The Lost Jewelry and the Alleged Depositum Contract</u>

Most of the important facts in this case are undisputed. In October 2000, two jewelry salesmen from New York, Robert Weinberg and his nephew, Jeffrey Reisman, traveled to Puerto Rico in order to see some clients and attempt to sell their jewelry. Both men worked as independent salesmen who owned their own separate companies. They each traveled to Puerto Rico with certain items of jewelry, carried in bags. The bags contained a large volume of relatively low-cost items; much of the jewelry was cubic zirconia. Weinberg estimated that Reisman's bag weighed 80 or 90 pounds; Reisman estimated that his own bag weighed about 60 pounds.

Most of the jewelry carried by Weinberg and Reisman on the October 2000 business trip was stock belonging to other companies who made jewelry. Most of the jewelry in Weinberg's bag came from co-plaintiff Astoria Jewelry Manufacturing, Inc. ("Astoria"); most of the jewelry in Reisman's bag came from co-plaintiffs P&S Shah Enterprises, Inc. ("Shah") and Eclipse

Collection, Inc. ("Eclipse").[1] Weinberg and Reisman held the jewelry from these companies in order to sell their products and received commissions from the jewelry companies for the sales. Some of the products possessed by Reisman and Weinberg could be sold directly to customers; others were merely low-cost samples that a customer could examine before deciding to order the real items from Astoria, Shah, and Eclipse.

On October 23, 2000, Reisman and Weinberg were traveling around Puerto Rico in a rented car; they were visiting various potential customers and attempting to make sales. During the early afternoon, Weinberg visited the jewelry store of defendant Barquet, in Old San Juan, while Reisman remained in the car with the jewelry bags, parked in front. Barquet was one of Weinberg's regular customers but not one of Reisman's regular customers. Weinberg knew the owners of Barquet well and would generally stop in to say hello when he was in the area.

Natalio Barquet, Jr. ("Natalio") is vice-president of Barquet; his father (who has the same name as his son) is president. Upon arriving at Barquet, Weinberg spoke to Natalio because Natalio's father was not there. Weinberg relates that he showed Natalio some bracelets, and Natalio seemed interested in

---

[1]Co-plaintiffs Jewelers Mutual Insurance Co., Art, Inc., and Kemper National Insurance Co. are the relevant insurers for Astoria, Shah, and Eclipse, respectively. The district court found Barquet liable, in varying sums, to Jewelers Mutual, Art, Kemper, and Shah. Astoria and Eclipse are not parties to this appeal.

potentially purchasing some of Weinberg's jewelry for his store; Natalio wanted his father to see the items the next morning. Weinberg states that he told Natalio he would return to the Barquet store at 10:00 the next morning.[2]

Weinberg and Reisman had another business appointment at a shopping center later that afternoon and they did not want to take their bags of jewelry to that appointment. Weinberg relates that he asked Natalio: "Listen, as long as I have an appointment here tomorrow morning, may I put my bags away here? That way I don't have to have them with me when I go make these other appointments." Natalio responded: "Fine." Natalio gave a similar account: he stated in deposition that Weinberg "asked . . . for permission [to] leave his bag in the store and come back for it later," and Natalio granted such permission. There was no further discussion of any terms relating to Weinberg's leaving the jewelry bags.

Weinberg then went outside to the rental car to get Reisman and the bags, and either Weinberg alone or Weinberg and Natalio carried the bags through the store and into a back room where a vault was located. Natalio accompanied Weinberg into this back room where either Weinberg alone or Weinberg and Natalio

---

[2]Natalio's account is somewhat different on this point. He stated in deposition that Weinberg never attempted to make a business appointment with his father and that Natalio indicated no interest in Weinberg's jewelry.

placed the bags into the vault. Weinberg left the store and drove off with Reisman. The two came back the next morning to retrieve the bags, but the bags were missing from the safe. A bag left by another salesman in the same safe was not taken. A police report was filed, but nobody has ever discovered the exact fate of the bags. See Astoria Jewelry v. Natalio Barquet, Inc., 291 F. Supp. 2d 16, 20 (D.P.R. 2003).

Weinberg and Reisman had left their jewelry bags at the Barquet store before. Natalio stated that he and his father customarily allowed salespeople to leave their bags in his vault, "[a]s a courtesy," when he or his father knew them and they asked permission. Written agreements were never signed in connection with these transactions, and detailed discussions of terms never occurred. Natalio described the entire practice as "very customary, very slack, not serious, and . . . involving no stipulation as to what the person leaves and when he or she might come back and pick it up."

When the Barquet store was closed, it was protected with an alarm system and gates. As well, the vaults were time-locked when the store was closed, including the night of October 23. When the Barquet store was open, however, it is undisputed that both Barquets, father and son, knew that the vault was always open and unlocked. The vault where the bags were placed is located in a back room of the store, accessible from the rest of the store; both

the father and the son also stated that customers could, in the ordinary course of business, be left by themselves in that area of the store, without being accompanied by an employee. There were security cameras inside the store, and several video monitors that employees could use to watch the scenes being captured by the cameras. However, the Barquets knew that the cameras were not set up to leave any videotaped record of what went on inside the store. Further, no security personnel were hired to watch the monitors: the regular store employees were charged with this duty, along with their other duties, such as assisting customers. Finally, Natalio and one of his employees testified in deposition that they felt no need to take any measures to safeguard the jewelry bags left in their vault. Natalio stated affirmatively that he took "[n]o measure[s] whatsoever" to take care of Weinberg and Reisman's bags while they were inside the vault, because Weinberg was merely "ask[ing] for a favor."

B. Barquet's Insurance

Barquet argues that it had contracted for two types of insurance that are relevant to this action. First, Barquet contracted with third-party defendant Integrand Assurance Co. ("Integrand") for commercial general liability insurance. Astoria Jewelry, 291 F. Supp. 2d at 20. This type of insurance was intended to protect Barquet from liability to third parties due to "bodily injury" or "property damage." However, the policy coverage

had various exceptions. The critical exclusion for purposes of this case was that the policy did not apply to "property damage to personal property in the care, custody, or control of the insured." The policy also stated that Integrand had a "right and duty to defend" any lawsuit seeking damages to which the insurance applies, but it would "have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply."

The second insurance policy that Barquet points to is a jeweler's block insurance policy it retained from third-party defendant European Underwriters ("EU"). See Astoria Jewelry, 291 F. Supp. 2d at 20. According to the policy's schedule of coverage, coverage in Barquet's case only applied to losses or damage to Barquet's "Stock (including other people's goods)."[3]

Jeweler's block insurance is a complex type of insurance that covers a broad combination of risks and dangers faced by jewelers. See generally 1 Couch on Insurance § 1.57. The parties agree that coverage of Barquet's "Stock (including other people's goods)" was "all risk" in the sense that coverage included all possible ways stock could be damaged or lost except those expressly

---

[3]The Slip Pro Forma, or summary, attached to the policy stated that coverage is for jewelry "being the property of the Assured and/or for which they bear the risks of insurance." The policy also contained an express exclusion for "goods entrusted to the Assured by private clients and/or customers solely for safe custody"; however, no such express exclusion existed for goods left solely for safe custody by other types of individuals.

excluded by a limitation or exclusion clause in the policy. See, e.g., Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n, 8 F.3d 760, 763 (11th Cir. 1993). Relevant to this case, the policy included what it called a "Locked Showcase Warranty," which stated: "It is a condition precedent to all liability of [EU], in respect of loss by Theft, that whilst the premises are open for business, all showcases, safes and cupboards containing Stock, and the rear of all display windows be locked and keys removed therefrom, other than during the process of items being added or removed by a responsible authorized person." Also, losses to stock were expressly not covered if they were a result of "stock taking losses, unexplained shortages and mysterious disappearances."

## II.

Co-plaintiffs Shah, Astoria, Eclipse and their respective insurers filed suit against Barquet in Puerto Rico federal district court on October 18, 2001, about one year after the bags were lost, seeking damages equal to the value of the lost jewelry plus interest, as well as attorney's fees. Jurisdiction was premised on diversity; the plaintiffs' theory was that, under Puerto Rico law, Barquet had entered into a "voluntary and gratuitous depositum contract" with Weinberg and Reisman to safeguard the bags of jewelry while they were located in the Barquet vault. The co-plaintiffs alleged that by not taking adequate precautions to ensure against

-10-

theft, Barquet was in breach of the terms of that depositum contract and therefore was liable for the value of the lost jewelry.

After the complaint was filed, Barquet contacted Integrand, its commercial liability insurer, requesting that Integrand take over Barquet's legal defense under the insurance policy's duty to defend clause. Integrand initially provided Barquet with an attorney, but, after further reviewing the complaint, determined that any damages under the facts and legal theory alleged in the complaint were not covered by its insurance policy, and instructed its attorney to withdraw from the case. Integrand stated that the depositum contract alleged to have been formed and breached in the complaint presupposed that the jewelry bags were in Barquet's "care, custody, or control" and thus any damages fell under one of the policy's exclusions.

On April 3, 2002, Barquet filed a third-party complaint against both Integrand and EU, its jeweler's block insurer. Barquet alleged that Integrand had wrongly failed to defend Barquet in the principal action. Moreover, Barquet alleged that monetary coverage under one or both of the Integrand and EU policies could apply, depending on the facts that developed during litigation, and thus either or both insurers might be required to reimburse Barquet for its liability to the co-plaintiff jewelers, in the event that those jewelers prevailed in the principal action against Barquet.

-11-

All parties in the case moved for summary judgment. By order dated October 29, 2003, the district court granted the co-plaintiffs' motion for summary judgment against Barquet. See Astoria Jewelry, 291 F. Supp. 2d at 32. The district court held that the undisputed facts established that Barquet and Weinberg and Reisman had entered into a depositum contract under Puerto Rico law when Weinberg asked if he could leave the jewelry bags in Barquet's vault, Barquet agreed, and the jewelry bags were actually placed in the vault. See id. at 24-26. Further, the district court held that once the depositum contract had been formed, Barquet, according to Puerto Rico civil law, undertook to care for the items as "a good father of a family" so long as they remained in its vault. See id. at 27. Based on the undisputed facts, and particularly Barquet's failure to lock or close the vault during the day, the district court held that Barquet did not meet this standard. Id. at 29.

In the same order, the district court granted the summary judgment motions of Integrand and EU on the claims filed by Barquet against them. The district court held that Barquet was not entitled to coverage from Integrand's commercial liability policy because Barquet's liability to the co-plaintiff jewelers under the depositum contract theory fell under the "care, custody, or control" exclusion in the policy. See id. at 29-30. The district court did not explicitly address Barquet's duty-to-defend claim against Integrand. The district court held that Barquet received no coverage from EU's

jeweler's block policy either, for three independent reasons. First, the jewelry bags at issue did not constitute part of Barquet's "Stock (including other people's goods)." See id. at 30. Second, coverage was barred by the "Locked Showcase Warranty," because Barquet had left its vault open during business hours. See id. at 31. Third, since the cause of the loss had never been found, coverage was also barred by the clause excluding coverage for "stock taking losses, unexplained shortages and mysterious disappearances." See id.

The district court determined that there was still an issue in controversy as to the value of the lost jewelry and the apportionment of this value among the various co-plaintiff jewelers and their insurers. See id. Thus, it ordered the parties to return for a bench trial on damages. See id. Such a bench trial was never held because, after the October 29 summary judgment order was issued, the parties agreed to stipulate that the total value of the co-plaintiffs' jewelry was $300,000. The parties also stipulated to the apportionment of these damages among the various co-plaintiffs. On May 11, 2004, the district court entered final judgment incorporating the damages stipulation of the parties. Barquet filed a timely appeal.

A. <u>Standard of review</u>

The parties disagree over the proper standard of review. Barquet contends that the district court's October 29 order was a garden-variety grant of summary judgment, and therefore our review of whether there are any genuine issues of material fact warranting trial is de novo. <u>See, e.g.</u>, <u>Fenton</u> v. <u>John Hancock Mut. Life Ins. Co.</u>, 400 F.3d 83, 87 (1st Cir. 2005). All of the other parties argue that this was not a standard grant of summary judgment, but instead that trial was waived and that the cross motions for summary judgment constituted, in effect, a referral of the action to the district court as a case stated. <u>See</u> <u>García-Ayala</u> v. <u>Lederle Parenterals, Inc.</u>, 212 F.3d 638, 644-45 (1st Cir. 2000). Thus, they contend, the district court was permitted to make factual findings and our review of these findings is only for clear error, although, of course, we still would exercise de novo review of any purely legal questions.

Barquet's position on this issue is correct; our review in this case is the standard de novo review of a district court's grant of summary judgment. It is true that no party requested a jury trial and Barquet has not contested, on appeal, that he effectively waived his right to a jury trial. But jury-waiver is not a sufficient condition for us to find that the parties intended to submit their case as a case stated rather than going to trial.

See id. The parties may still have intended to treat summary judgment as a separate phase, and then proceed to a bench trial. Nor does the fact that cross motions for summary judgment were filed necessarily mean that the parties intended to offer the district court a case stated. See United Paperworkers Int'l Union Local 14 v. Int'l Paper Co., 64 F.3d 28, 31 n.2 (1st Cir. 1995).

The touchstone of our inquiry is "the intentions of the parties and the district court judge, as evidenced by the record on appeal." García-Ayala, 212 F.3d at 644. Our reading of the intent of the district court and the parties below is that they did not view the case as a case stated. The district court, at the outset of its October 29 order, laid out the ordinary summary judgment standard in considerable detail. Astoria Jewelry, 291 F. Supp. 2d at 21. Further, the parties jointly filed a "Proposed Pretrial Order" on September 25, 2003, between the time their respective summary judgment motions were filed and the time the district court's October 29 order granting summary judgment was issued. This 55-page proposed order dealt with each party's witnesses, exhibits, and legal theories to be presented at trial in a detailed way. This is an indication that the parties did not believe their summary judgment motions would necessarily dispose of the entire case; they believed a bench trial could be necessary. We note finally that our application of a de novo standard rather than more deferential

review has no effect on the outcome of this appeal.  We would affirm either way.

B. <u>Barquet's Liability: The Depositum Contract</u>

1. <u>Applicable Law</u>

Under Puerto Rico law, depositum contracts can be governed by either the Commercial Code or the Civil Code.  <u>See</u> 10 P.R. Laws Ann. § 1621 <u>et seq.</u>; 31 P.R. Laws Ann. § 4621 <u>et seq.</u>  Barquet argues that the Commercial Code governs in this case; the plaintiffs contend instead that the Civil Code applies.  The district court held that Barquet had waived its general argument about the applicability of the Commercial Code by failing to raise it in an Initial Scheduling Conference or a subsequent scheduling conference. <u>See</u> <u>Astoria Jewelry</u>, 291 F. Supp. 2d at 23-24.  We do not treat or rely upon the district court's theory of waiver, but of course we may affirm summary judgment against Barquet on any ground supported by the record.

A depositum contract is deemed commercial, and therefore governed by the Commercial Code rather than the Civil Code, only in situations where three conditions are met.  First, the depositor must be a merchant; second, the items deposited must be commercial goods; and third, the deposit must "constitute in itself a commercial transaction, or be made by reason of commercial transactions."  10 P.R. Laws Ann. § 1621.  To our knowledge, no Puerto Rico court has interpreted this provision.  The first two

-16-

prongs are met here. On the third prong, the deposit was not in itself a commercial transaction, but Barquet argues that it was made "by reason" of such a transaction because, according to Weinberg, the bags were left in anticipation of the next morning's meeting at the Barquet store, where Weinberg would attempt to sell jewelry to Barquet. Since Natalio testified that no such meeting was ever set, this is an odd argument for Barquet to make.

We are doubtful that the facts here are sufficient to meet the third prong, but even assuming dubitante that a commercial deposit was formed, the provisions of the Commercial Code are of no assistance to Barquet. Barquet points to two provisions of the Commercial Code as aiding its appeal.

First, Barquet alludes briefly to 10 P.R. Laws Ann. § 1302, which states that for commercial contracts, "the testimony of witnesses shall not in itself be sufficient to prove the existence of a contract the amount of which exceeds three hundred dollars, unless such testimony concurs with other evidence." Although Barquet's general argument about the applicability of the Commercial Code was not an affirmative defense and need not have been pled, by contrast any reliance on this specific provision, § 1302 -- which is in the nature of a statute of frauds -- is an affirmative defense under Fed. R. Civ. P. 8(c). Affirmative defenses must be pled or they will generally be deemed waived and excluded from the case. See, e.g., Honey Dew Assocs., Inc. v. M & K Food Corp., 241 F.3d 23,

-17-

26 (1st Cir. 2001). Yet Barquet did not originally plead this provision in its answer, nor did it ever file a motion to amend its answer. See Astoria Jewelry, 291 F. Supp. 2d at 23. Thus, any suggestion by Barquet that this contract is unenforceable under § 1302 because unwritten has been waived.

Second, Barquet argues that the district court erred in applying the standard of care for deposited goods found in the Civil Code -- the "good father of a family" standard, see 31 P.R. Laws Ann. § 3021 -- instead of the standard of care under a commercial depositum contract governed by the Commercial Code. Under the Commercial Code, a commercial depositary is "liable for the injury and damage the articles deposited may suffer by reason of his malice or negligence, and also for those arising from the nature or defects of the articles, if he should not in the latter cases personally have done all that was possible in order to avoid or remedy them . . . ." 10 P.R. Laws Ann. § 1624. Barquet's argument assumes it would be better off if the Commercial Code standard rather than the Civil Code standard applied. This assumption is incorrect.

Barquet observes that, unlike the Civil Code, see 31 P.R. Laws Ann. § 3192, there is no express provision in the Commercial Code establishing a presumption of the depositary's negligence for deposited goods lost or damaged while in his possession. Such a presumption is familiar from common law bailment, where it exists to force the bailee to come forward with the information it has

available, since it, as holder of the bailed items, is in a better position than the bailor to determine the cause of the loss. See, e.g., Goudy & Stevens, Inc. v. Cable Marine, Inc., 924 F.2d 16, 18-19 (1st Cir. 1991). This case does not turn on the presence or absence of the depositary's presumption of negligence. And, although it seems that no Puerto Rico court has interpreted § 1624, it is not obvious that the Commercial Code's standard is lower than the Civil Code's "good father of a family" standard, which -- as we explain below -- has been interpreted by the Puerto Rico Supreme Court to impose liability only for ordinary negligence. Indeed, the last clause of § 1624 suggests a higher standard of care for commercial depositum contracts than for civil depositum contracts in certain circumstances. Barquet offers no reason why the standard would be lower for commercial depositum contracts than for ordinary, civil depositum contracts.

Since Barquet has waived any argument under § 1302 and it would not aid Barquet for us to apply the Commercial Code rather than the Civil Code, we will analyze the rest of this case under the Civil Code provisions, which are both more comprehensive and better glossed by the Puerto Rico courts.

2. Formation

Barquet challenges the district court's ruling that it is liable to pay the co-plaintiff jewelers (as well as those jewelers' insurers) for the lost jewelry.

-19-

The district court's ruling hinged on its holding that under Puerto Rico law, a depositum contract was formed between Barquet and Weinberg and Reisman. The depositum contract is a civil law concept, existing in Louisiana as well as Puerto Rico, that has some relationship with the common law concept of bailment. The two concepts, however, are not identical and therefore one must be cautious in using notions derived from bailment to determine the nature of the depositum contract. See generally Michael H. Rubin, Comment, Bailment and Deposit in Louisiana, 35 La. L. Rev. 825 (1975).

The depositum contract under the Puerto Rico Civil Code, which is derived from relevant provisions of the Spanish Civil Code, is in essence a contract whereby one person (the depositor) hands a piece of personal property to another person (the depositary) for the sole purpose of having the depositary keep, conserve, and return the property. See, e.g., Rivera v. San Juan Racing Ass'n, 90 P.R.R. 405, 411 (1964) ("[I]n [depositum contracts] the obligation of custody appears autonomous in nature, it is the essence of the contract itself."); 4 Jose Castan Tobeñas, Spanish Civil, Common and Local Law 681 (12th ed. 1985) ("[T]he essential characteristic of the deposit is that of the handing over of the thing, with the sole and exclusive end of its keeping, conservation and return . . . ."). Thus the depositary cannot use the property without the depositor's permission, see 31 P.R. Laws Ann. § 4662, and such permission

transforms the contract into a loan rather than a deposit, see id. § 4663. Further, the depositary must return the property to the depositor when the latter demands its return. See id. § 4670.

A depositum contract can arise in various contexts. A business can act as depositary when it agrees to safeguard an item while performing some service on it for the depositor. See, e.g., M.A. Caribbean Corp. v. Caribbean Rustproofers, Inc., 115 P.R. Offic. Trans. 896, 900 (1984) (depositum contract formed when tow truck delivered for rustproofing); Am. Sec. Ins. Co. v. Ocasio, 102 P.R. Offic. Trans. 207 (1974) (same with respect to car delivered to garage for paint work). Further, a creditor can act as depositary when it attaches a debtor's property in order to secure the effectiveness of a judgment. See Rodríguez Soto v. Adorno, 104 P.R. Offic. Trans. 901 (1976). Neither of these, of course, is the situation here.

But the context here, where a salesman asks a store for permission to leave his wares in its vault, and the store grants such permission out of friendship or kindness without demanding any compensation for the service, can also create a depositum contract. The Civil Code of Puerto Rico is clear that consideration or compensation to the depositary is not necessary to form a depositum contract -- in fact, the depositum contract is presumed gratuitous absent some agreement to the contrary. See 31 P.R. Laws Ann. § 4641. Similarly, it is not necessary that the depositor act out of

some business motive; a depositum contract is formed if the depositary's motive in accepting the depositor's property is simple courtesy. See 22:1 Manuel Albaladejo, Private Law Review: Comments to the Civil Code and Local Compilations 198-99 (1980) (explaining as paradigmatic the case where a passerby, without asking for any compensation, agreed to care for another person's oxen in a public market for a few moments).

When determining whether the parties have formed a depositum contract, the Puerto Rico Supreme Court has, as the district court noted, focused on "whether or not the delivery of the thing has been accomplished, whether the [depositary] has received the effective possession and control of the thing to the point of excluding the possession of the owner himself . . . ." Nicole v. Ponce Yacht Club, 96 P.R.R. 286, 290 (1968); see also Rivera, 90 P.R.R. at 414-417. Here, delivery was accomplished when Weinberg placed the jewelry bags -- with Barquet's permission -- in the Barquet vault. Barquet attained effective and exclusive possession and control of the jewelry bags at that time because they were placed inside Barquet's own vault, in a back room of its store.

Barquet hangs its argument that no depositum contract was formed chiefly on an alleged lack of consent. While it admits that it consented to allowing Weinberg to place the jewelry bags in its vault, it argues that there is no evidence that it consented to safeguard the jewelry bags while they were left in the vault. It

is true that Natalio agreed that Weinberg could leave the jewelry bags in the Barquet vault but that there was no further discussion of contractual terms. The lack of such discussion is, however, irrelevant.

The Puerto Rico Supreme Court has not discussed consent as an element in any of its cases on depositum contracts; instead, as already noted, in Rivera and Ponce Yacht Club it focused on the depositor's delivery of the deposited items and the depositary's subsequent effective and exclusive possession and control of those items. The proper reading of this case law, which is in accord with the commentators, is that the depositary's consent to be bound by the statutory terms of the depositum contract -- including the statutory requirement that a depositary safeguard the deposited goods -- can be inferred from the depositor's delivery of an item to the depositary, the depositary's knowing acceptance of that item, and the depository's effective and exclusive possession and control over the item. See Albaladejo, supra, at 191 n.2. Louisiana law on the depositum contract allows a similar inference of consent. See, e.g., United States Fid. & Guar. Co. v. Dixie Parking Serv., Inc., 262 So. 2d 365, 367 (La. 1972). Barquet argues that Rivera and Ponce Yacht Club are inapposite, because they involved situations in which the parties clearly had formed some kind of contract and the only question was the type of that contract. But this is a distinction without a difference: even though these cases

-23-

dealt with acknowledged contracts, the Puerto Rico Supreme Court was still required to infer consent by the depositary to be bound by the statutory terms of a depositum contract.

Barquet's consent to form a depositum contract, as governed by the Puerto Rico statutes, was properly inferred by the district court from the parties' silence when Weinberg delivered the jewelry to Barquet's vault, Barquet agreed to accept the items, and the items were actually placed in Barquet's vault. Barquet did not make any express statement that it refused to be bound by the obligations of a depositary.

Barquet argues that the parties' intent was more consistent with a desire to form a civil law legal arrangement known as a "deposit in tolerance," where Barquet would merely allow Weinberg and Reisman to leave their jewelry in its store but would take no responsibility for the safekeeping of this jewelry, than with a classic depositum contract with its attendant obligations. The "deposit in tolerance" has never been recognized by the Puerto Rico courts, and the commentator that Barquet itself relies on describes the concept as a "doubtful supposition[]." See Albaladejo, supra, at 199. The scheme established in Puerto Rico requires us to infer consent to form a full-fledged depositum contract, with its statutory obligations, whenever an item has been delivered by the depositor and is in the effective and exclusive possession and control of the depositary. At least absent some

-24-

express statement by the parties, we are not permitted to infer consent to some lesser set of obligations.

Barquet finally argues that we should not infer a depositum contract here because of the imbalance between Barquet's nonexistent gain from the depositum contract and its substantial liability once the jewelry was stolen. But the Puerto Rico Civil Code seems to contemplate just such an imbalance when it allows for -- and indeed presumes -- that Civil Code depositum contracts are gratuitous.[4]

We hold that the parties entered into a depositum contract, constituted when the jewelry was placed in Barquet's

------

[4]Barquet, citing the Supreme Court of Spain, also contends that no depositum contract could form because the parties intended to leave the jewelry in the vault as mere preparation for subsequent contractual negotiations between Weinberg and Barquet over Barquet's purchase of jewelry. See TS of Spain, June 14, 1960 (R.J., No. 2093) (no depositum contract where platform car was delivered to company for inspection so that price of contract performing work on car could be determined). Even assuming that the Puerto Rico Supreme Court would adopt the Spanish law on which Barquet relies and even taking Weinberg's testimony as true, the items here were not left as part of negotiations for a future contract. Barquet's store offered a convenient drop-off point because of the next morning's meeting. However, Weinberg did not leave the bags for Barquet to inspect pending that meeting; he left them instead because he wanted them to be kept safe while he went elsewhere.

vault.[5]  We will proceed to examine Barquet's standard of care under that contract.

3. Standard of Care

The depositary must, under a depositum contract governed by the Puerto Rico Civil Code, safeguard deposited items with the care of a "good father of a family."  See 31 P.R. Laws Ann. §§ 3021, 4661; Ocasio, 102 P.R. Offic. Trans. at 209.  The "good father" standard established in section 3021 (which is entitled "What constitutes fault or negligence") is a default standard when the parties have not established some other standard, and it is not exclusive to depositum contracts, but is applied more broadly to certain other areas of the law.

The Puerto Rico Supreme Court has interpreted the standard in a way that has made it quite similar to ordinary negligence.  The question is whether the depositor exercised "the proper diligence, which generally should be that which 'an average or normal type of

_____

[5]Barquet briefly challenges whether Reisman, as opposed to Weinberg, was properly a party to the depositum contract because Weinberg, and not Reisman, asked for permission and placed the bags in the vault.  Barquet moreover challenges whether Reisman or Weinberg were representatives of co-plaintiffs Shah and Eclipse. These arguments were not addressed by the district court and were not adequately raised by Barquet below.  Barquet, in its statement of contested facts in opposition to the plaintiffs' motion for summary judgment, "denied" that Weinberg and Reisman had a representative relationship with Astoria, Shah, and Eclipse, and stated that this fact was "in controversy," but it provided no further elaboration anywhere on this argument.  Further, nothing was said below about Reisman not being a party to the depositum contract.  These arguments are forfeited.  See, e.g., B&T Masonry Constr. Co. v. Pub. Serv. Mut. Ins. Co., 382 F.3d 36, 41 (1st Cir. 2004).

diligent person' would have exerted." Ocasio, 102 P.R. Offic. Trans. at 212; see also Rodríguez Soto, 104 P.R. Offic. Trans. at 909. Thus, ordinary measures must be taken, but extraordinary or unusual steps need not. See, e.g., Ocasio, 102 P.R. Offic. Trans. at 212-13 ("good father of a family" standard met where depositary of car left for paint work surrounded premises with wire fence, barbed wire, and locked gates, despite depositary's failure to take "additional precautions," such as maintaining a watchman or watchdogs).

Barquet properly points out that the issue of negligence is generally left to the jury, even where there are no undisputed material facts, at least in a tort context. See Joyal v. Hasbro, Inc., 380 F.3d 14, 21 n.3 (1st Cir. 2004). But the judge can properly decide the issue on summary judgment if the material facts are undisputed and no reasonable jury could decide in favor of the nonmoving party. See id.; Commonwealth Utils. Corp. v. Goltens Trading & Eng'g PTE Ltd., 313 F.3d 541, 546 (9th Cir. 2002).

The undisputed evidence demonstrated that defendant knew that its vault was always open during the day; it admitted as well that customers could easily access the room in the store where the vault was located and were sometimes left alone in that room. The video cameras did not record, there were no hired security personnel, and Barquet's employees felt no responsibility to care for the jewelry bags. Leaving very expensive bags of jewelry in

-27-

such a state represented a failure to take even basic precautions --
no reasonable jury could find that Barquet exercised the care which
"an average or normal type of diligent person" would have exercised.
Barquet makes no argument about action it took that would raise a
jury question as to whether it met its standard of care.  The grant
of summary judgment against Barquet on the depositum contract claim
is affirmed.[6]

C. Barquet's Third-Party Claims Against Its Insurers

1. Duty-to-Defend Claim Against Integrand

Barquet contends that the district court erred in granting
Integrand summary judgment on Barquet's claim that Integrand,
Barquet's commercial liability insurer, had a duty to defend Barquet
against the lawsuit brought by the co-plaintiff jewelers (Astoria,
Shah, and Eclipse) and their insurers.  Barquet has not appealed the
district court's finding that Integrand need not pay to indemnify

---

[6]We acknowledge that Barquet is now facing substantial
liability despite receiving no compensation for holding the
deposited jewelry.  But the standard of care imposed on a
depositary under Puerto Rico law appears to be the same regardless
of whether the depositary receives anything in return for holding
the deposited items.  This is different from the traditional rule
under common law bailment, which uses different standards of care
for different sorts of bailments and holds an uncompensated bailee
liable only for gross negligence.  See Rubin, supra, at 826; see
also La. Civ. Code Ann. art. 2930 (imposing higher standard on
compensated depositaries under the Louisiana law of deposit).
Puerto Rico explicitly rejected an approach that would have
established different standards of care for different types of
depositum contracts, instead adopting a unified but flexible
standard -- the "good father of a family" standard -- that takes
into account the specific circumstances of each case.  See Ocasio,
102 P.R. Offic. Trans. at 209-11.

Barquet for its liability in this underlying action; Barquet commendably admits, in fact, that the depositum contract theory that the district court used to grant relief falls under a policy exemption because it presupposes that the lost jewelry was under Barquet's "care, custody, or control" when taken.

Under Puerto Rico law, the duty to defend is measured by the allegations in a plaintiff's complaint -- if any of these allegations, read liberally, state facts that would be covered by a liability policy if proven true, then the insurer must provide a defense for the insured defendant. See, e.g., Martinez Perez v. Universidad Central de Bayamon, Inc., 143 P.R. Dec. 554, 562 (1997) (Official Translation); Pagán Caraballo v. Silva Delgado, 122 P.R. Offic. Trans. 98, 102-03 (1988).

Barquet argues that, aside from the depositum contract claim, the complaint of the co-plaintiff jewelers and their insurers also alleges a separate claim of tort-law negligence. The complaint cannot reasonably be read this way. The co-plaintiffs were only seeking relief on a depositum contract theory. The references to "negligence" are located within the complaint's discussion of this contract count, and are intended merely as references to the standard of care under a depositum contract. Barquet briefly argues that we can go beyond the allegations in the complaint to look at extrinsic evidence in determining whether Integrand had a duty to defend. Puerto Rico has never adopted such an approach. See, e.g.,

-29-

Martinez Perez, 143 P.R. Dec. at 562 ("[I]f the allegations clearly exclude the damages claimed from the coverage of the policy, the duty to defend cannot be imposed upon the insurance company.") The district court's ruling that Integrand had no duty to defend was correct.

## 2. Indemnification Claim Against EU

Barquet argues that, under the terms of its jeweler's block policy, EU must indemnify Barquet for its liability to the co-plaintiff jewelers and their insurers, and the district court erred in holding to the contrary. Barquet is incorrect. Puerto Rico law instructs us to read insurance contracts in accordance with their plain meaning, as a whole, and in harmony with the general purposes of the policy; moreover, we are instructed to read exclusionary clauses strictly and only enforce them where their applicability to the case at hand is clear. See, e.g., Quiñones López v. Manzano Pozas, 141 P.R. Dec. 139 (1996) (Official Translation); Pagán Caraballo, 122 P.R. Offic. Trans. at 101.

Coverage exists, according to the policy schedule, only for losses or damage to Barquet's "Stock (including other people's goods)." We need not determine whether the jewelry at issue here comes within the meaning of this clause.

Even assuming arguendo that it does, coverage is barred by the "Locked Showcase Warranty." This provision makes it a condition precedent to liability, "in respect to loss by Theft, that

whilst the premises are open for business, all showcases, safes and cupboards containing Stock, and the rear of all display windows be locked and keys removed therefrom." It is undisputed that the vault where the lost jewelry bags were placed was always open and unlocked during business hours. Barquet argues that there is no evidence the jewelry was lost by theft, but under the circumstances no reasonable jury could come to any other conclusion. Moreover, Barquet contends that the jewelry lost is not covered by the "Locked Showcase Warranty" because it is not "stock." This argument leads nowhere because, under the policy schedule, only goods considered "stock" are covered by this policy at all. The reference to "other people's goods" modifies "stock" and does not stand on its own: only "other people's goods" that constitute "stock" are covered.

We expressly decline, as unnecessary, to rely on the last ground stated by the district court, the EU policy exemption for "stock taking losses, unexplained shortages and mysterious disappearances."

**IV.**

The district court's grant of summary judgment in favor of co-plaintiffs Astoria, Shah, and Eclipse (as well as their insurers) on the depositum contract claim is **<u>affirmed</u>**. The district court's grants of summary judgment in favor of Integrand and EU on Barquet's third party insurance claims are also **<u>affirmed</u>**.