# United States Court of Appeals
## For the First Circuit

No. 20-1145

UNITED STATES OF AMERICA,

Appellee,

v.

LUIS MIGUEL SIERRA-AYALA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Pedro A. Delgado-Hernández, U.S. District Judge]

Before

Barron, Chief Judge,
Selya and Lipez, Circuit Judges.

Kevin E. Lerman, with whom Eric Alexander Vos, Federal Public Defender, and Franco L. Pérez-Redondo, Assistant Federal Public Defender, Supervisor, Appeals Division, were on brief, for appellant.
Francisco A. Besosa-Martínez, with whom W. Stephen Muldrow, United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

July 5, 2022

**LIPEZ, Circuit Judge**. On January 29, 2017, Luis Miguel Sierra-Ayala was standing near his parents' house in Loíza, Puerto Rico, holding a black Adidas bag, when officers from the Puerto Rico Police Department arrived and gave chase to several other individuals who had been standing nearby. One of the officers approached Sierra-Ayala and discovered drugs within the bag. After arresting him, the officer discovered a handgun with an obliterated serial number on Sierra-Ayala's person. Sierra-Ayala filed a motion to suppress the evidence recovered during his arrest, arguing that he was seized in violation of the Fourth Amendment and that he was coerced into handing over the bag, which he claimed to be safeguarding for his cousin. After the district court denied the motion to suppress, Sierra-Ayala was convicted of four offenses relating to the possession of the weapon and the drugs. Sierra-Ayala appeals from this conviction, seeking review of the district court's denial of the motion to suppress and of limitations on cross-examination imposed during the trial. We affirm.

**I.**

**A. Factual Background**

We recite the "facts in the light most favorable to the district court's ruling" on Sierra-Ayala's motion to suppress, "noting where relevant [Sierra-Ayala]'s contrary view of the testimony presented at the suppression hearing." United States v. Rodríguez-Pacheco, 948 F.3d 1, 3 (1st Cir. 2020) (first quoting

United States v. Camacho, 661 F.3d 718, 723 (1st Cir. 2011); and then quoting United States v. Young, 835 F.3d 13, 15 (1st Cir. 2016)).

### 1. The January 29, 2017 Operation

On January 29, 2017, officers from the Puerto Rico Police Department ("PRPD") deployed to a "known drug point" on Melilla Street in Loíza, Puerto Rico. The operational plan was to conduct surveillance and to act if the officers observed criminal activity. Melilla Street is a residential street, with houses on both sides. The drug point targeted by the PRPD operational plan was in a wooded area of Melilla Street, near a vacant lot.

At about 8:50 a.m., PRPD officers arrived at the drug point in six or seven vehicles. Two vehicles were marked with the PRPD emblem and the rest were unmarked. Sergeant Jesús López-Maysonet was dressed in plainclothes and traveled with two fellow officers, Hector Garcia Nieves and Daniel López Garcia, in an unmarked car. As he arrived at the drug point, the sergeant observed seven or eight individuals with messenger-style bags. He testified that, based on his training and experience, this type of bag is frequently used to carry drugs and weapons. Sergeant López-Maysonet parked the car he was driving in a yard next to a house. The three officers then exited the vehicle and identified themselves as police officers by shouting "police." All but one of the individuals fled into the adjacent wooded area. As Officers

- 3 -

Garcia Nieves and López Garcia chased the fleeing individuals, other officers were arriving at the site.

Sierra-Ayala was the man who did not flee; he remained sitting in a plastic chair as Sergeant López-Maysonet approached. The sergeant testified that Sierra-Ayala was wearing a black messenger-style bag across his chest. At the initial suppression hearing before the magistrate judge, López-Maysonet testified that after he identified himself to Sierra-Ayala as a police officer, Sierra-Ayala stood up, turned to the right, and showed him the contents of the bag. Sierra-Ayala testified differently. He claimed that he was concerned for his safety when Sergeant López-Maysonet approached him, and that the sergeant directed him to turn over the bag, which he had been holding in his hands. Sierra-Ayala testified that he complied with Sergeant López-Maysonet's request because he did not feel free to disobey the officer's direction. Ultimately, the magistrate judge credited Sergeant López-Maysonet's version of the interaction.

When the sergeant looked inside the bag, he saw "a transparent plastic bag" containing "purple packages that are used to pack heroin." Upon seeing the packaging, he informed Sierra-Ayala that he was under arrest, directed him to stand up, and read him his Miranda rights. Because Sergeant López-Maysonet did not have handcuffs on his person, he radioed for backup. After Sierra-Ayala was handcuffed, he patted him down and identified a gun in

a holster on the left side of Sierra-Ayala's belt. López-Maysonet also testified that he retrieved $94 in cash from Sierra-Ayala's pockets. Sierra-Ayala testified that only $10 belonged to him and that the remainder of the cash was recovered from the bag belonging to his cousin.

## 2. Sierra-Ayala's Involvement

Sierra-Ayala testified at the two suppression hearings about how he came to be at the drug point on Melilla Street on January 29, 2017. Because this testimony is relevant to Sierra-Ayala's motion to suppress, we summarize it here.

Sierra-Ayala grew up in a house on Melilla Street about five or six houses away from the site of his arrest. Although he now lives with his wife and two children in a different area of Loíza, Sierra-Ayala returned to his parents' house on Melilla Street between 6:00 and 7:00 a.m. on January 29, 2017 to work on a Nissan Pathfinder that he was keeping and repairing there. On the morning of his arrest, Sierra-Ayala was waiting for his friend Jose Carlos, who was going to help him remove the radiator from the Pathfinder and take him to purchase a replacement.

At about 8:30 a.m., Sierra-Ayala stopped working on his car and went to buy a soda and cigarettes from his cousin, who sells refreshments from his grandmother's house. This house is across the street from Sierra-Ayala's parents' house. Because the items Sierra-Ayala wished to purchase cost around $3 and his cousin

- 5 -

did not have change for Sierra-Ayala's $10 bill, Sierra-Ayala went off in search of change. He walked toward a group of individuals further down Melilla Street -- which included another one of Sierra-Ayala's cousins, Jean Carlos Sirino -- and attempted to get change from Jean Carlos. While Jean Carlos searched for change, he passed the bag he was holding to Sierra-Ayala. Sierra-Ayala testified that the zipper of the bag was closed, and that he had been holding the bag for "[a]round five seconds" when the PRPD officers arrived. As discussed above, Sierra-Ayala testified that the officers' arrival and Sergeant López-Maysonet's approach and alleged order made him feel that he had no choice but to hand over the bag.

**B. Procedural History**

Sierra-Ayala pled not guilty to four charged offenses. He filed a motion to suppress the gun and drugs discovered by Sergeant López-Maysonet, arguing that the sergeant lacked reasonable suspicion to support the initial seizure and that the discovery of contraband in the bag was coerced.[1] Sierra-Ayala argued that his presence on Melilla Street was not unusual and that he was not engaged in any suspicious activity when the officers arrived in their vehicles. In response, the government

---

[1] Sierra-Ayala also sought to suppress his post-arrest statements, on the basis that they were the fruit of an illegal arrest.

argued that Sierra-Ayala was not seized at the time Sergeant López-Maysonet approached him, and that López-Maysonet acquired probable cause to arrest Sierra-Ayala after Sierra-Ayala voluntarily displayed the contents of his bag.

**1. Initial Suppression Hearing Before the Magistrate Judge**

The magistrate judge held a hearing on Sierra-Ayala's motion to suppress. Sergeant López-Maysonet and Sierra-Ayala were the only witnesses, and they testified to the facts as outlined above. During cross-examination, the sergeant testified that he had forgotten to identify the holster seized from Sierra-Ayala in two separate reports filed after the arrest.

Prior to defense counsel's cross-examination of Sergeant López-Maysonet, the government provided the court with information on four administrative complaints that had been filed against the sergeant. The magistrate judge determined that only one incident had the potential to be Giglio material,[2] and permitted defense counsel to cross-examine López-Maysonet about the incident. The following exchange occurred:

> [Defense Counsel]: Sergeant [López-]Maysonet, there was an administrative complaint against you as a result of a theft or loss of monies during a warrant -- execution of a warrant. Is that correct?

---

[2] See Giglio v. United States, 405 U.S. 150, 154-55 (1972) (holding that evidence relevant to the credibility of a government witness must be disclosed); Roe v. Lynch, 997 F.3d 80, 82 (1st Cir. 2021) (reciting the holding of Giglio).

[López-Maysonet]: That's not right.

After Sergeant López-Maysonet reviewed the administrative complaint, he explained:

[López-Maysonet]: Like I was telling you, I was the supervisor and I did the writ for the Lieutenant [Daniel López García].

[Defense]: Is that administrative complaint as against you or is it as against someone else, the [complaint] in front of you?

[López-Maysonet]: It's against Officer Daniel Lopez [García].

[Defense]: It's not against you?

[López-Maysonet]: No.

[Defense]: Does your name appear in that document?

[López-Maysonet]: It only shows my last name, Lopez Maysonet.

. . .

[Defense]: What is the nature of the allegation?

[López-Maysonet]: The nature of the allegation was that when I was supervising a search and arrest, the person that was subject of the warrant, Mr. Abner Arroyo, . . . gave me some money, I counted the money and then an amount of money went missing. We went to the video, we saw the video again and then there was some money missing when I was counting it and then Officer Lopez Garcia said that he had taken it as a joke in order for us to see what happens when someone else from outside gets involved.

Officer López García was involved in the operation that led to Sierra-Ayala's arrest. According to Sergeant López-Maysonet,

Officer López García "was in the vehicle but was not present at the arrest. He was in the wooded area while [Sergeant López-Maysonet] was arresting" Sierra-Ayala.

At the end of the hearing, the magistrate judge directed the parties to file simultaneous supplemental briefs addressing whether Sierra-Ayala had a reasonable expectation of privacy in the contents of the bag.

**2. The Magistrate Judge's Report and Recommendation**

In its supplemental brief, the government argued that Sierra-Ayala lacked standing to challenge a Fourth Amendment violation because he had no privacy interest in the bag.[3] The government noted that Sierra-Ayala testified that his cousin had passed him the bag and that he had held it for only five to thirty seconds before the officers arrived. The government also argued that the court should credit Sergeant López-Maysonet's hearing testimony rather than Sierra-Ayala's because Sierra-Ayala's narrative contained several implausibilities.

Sierra-Ayala's supplemental brief argued for the opposite conclusion. In particular, Sierra-Ayala argued that he had a possessory interest in the bag in the form of a bailment, giving rise to a reasonable expectation of privacy, and that

---

[3] As the magistrate judge noted, "standing" for Fourth Amendment purposes is distinct from Article III standing. Byrd v. United States, 138 S. Ct. 1518, 1530 (2018); see also infra Section II.C.

Sergeant López-Maysonet's testimony was incredible and embellished. Sierra-Ayala also reiterated his argument that the encounter with Sergeant López-Maysonet was a seizure rather than a consensual encounter, and that López-Maysonet lacked reasonable suspicion for the stop.

In a Report and Recommendation, the magistrate judge credited Sergeant López-Maysonet's testimony about how the incident on January 29 unfolded. The magistrate judge described López-Maysonet's demeanor and tone as convincing, and his version of the events as plausible and logical. The judge found Sierra-Ayala's testimony facially less plausible for several reasons. First, the magistrate judge expressed skepticism about the reported price of Sierra-Ayala's intended purchases and the lack of change for a relatively small bill in a home business selling inexpensive items. The judge also found the suggestion that Sierra-Ayala had only been holding the bag for five seconds before the PRPD officers arrived not credible. The magistrate judge credited López-Maysonet's testimony that "he said nothing other than that he was a police officer. Sierra-Ayala then stood up and showed Lopez the contents of the shoulder bag without any other prompting."

Finding that Sierra-Ayala voluntarily displayed the contents of the bag to López-Maysonet, and that the officers' show of force upon arriving to Melilla Street would not have caused a

reasonable person to believe he was not free to leave, the magistrate judge recommended that the district court find that Sierra-Ayala was not seized. The Report and Recommendation also concluded that Sierra-Ayala lacked standing to challenge the search and seizure of the bag because he lacked a reasonable expectation of privacy in the bag. The magistrate judge recommended that the court deny Sierra-Ayala's motion to suppress for both of these reasons.

Sierra-Ayala objected to the Report and Recommendation and requested a de novo hearing before the district court.[4] Specifically, Sierra-Ayala objected to the magistrate judge's favorable assessment of Sergeant López-Maysonet's credibility and to the magistrate judge's conclusions that no Fourth Amendment seizure occurred and that Sierra-Ayala lacked standing to challenge the search of the bag.

### 3. De Novo Hearing Before the District Court

The district court scheduled a de novo hearing in response to Sierra-Ayala's objection to the Report and Recommendation. The government subsequently filed a motion to vacate the de novo hearing, which the district court denied. The

---

[4] Under 28 U.S.C. § 636(b)(1), the district court "shall make a de novo determination of those portions of the [Report and Recommendation] to which objection is made." In doing so, the court "may . . . receive further evidence" on the matter, id., including via an evidentiary hearing, see United States v. Lawlor, 406 F.3d 37, 40 (1st Cir. 2005).

government then filed a motion to limit the scope of the de novo hearing to the question of standing, arguing that it presented a threshold issue because "the legality of the seizure is not properly before the Court" until Sierra-Ayala establishes standing. The district court granted that motion two days later, without waiting for a response from Sierra-Ayala.

At the de novo hearing, Sierra-Ayala and Sergeant López-Maysonet reiterated much of their testimony from the initial suppression hearing before the magistrate judge. Sierra-Ayala testified that when his cousin handed him the bag, it was his understanding that he "w[as] to hold th[e] bag until [Jean Carlos] got change for [Sierra-Ayala]," he was "responsible for th[e] bag," and it was his understanding that he "could not give it to anyone else." Sierra-Ayala explained that he "turned [the bag] over to the police[] because [Sergeant López-Maysonet] told [him] to turn it over." Sierra-Ayala also testified that he was at the site for only about five seconds before police arrived, and that his cousin had never asked him to watch anything in the past. He explained that the site of his arrest was "[f]our or five houses" away from his mother's house. Sergeant López-Maysonet reiterated his prior testimony that Sierra-Ayala had displayed the contents of the bag to him voluntarily.

After the de novo hearing, the district court subsequently issued an opinion and order "adopt[ing] the R&R's

recommendation as it relates to the issue of standing, and den[ying] Sierra-Ayala's motion on such basis." The court assumed, "[f]or purposes of this Opinion and Order, . . . that the interaction between Sierra-Ayala and Sergeant López[-Maysonet] occurred the way Sierra-Ayala described it." In other words, the court assumed that Sergeant López-Maysonet ordered Sierra-Ayala to display the contents of the bag to him, but nevertheless concluded that Sierra-Ayala lacked standing to challenge the search.[5]

In finding that Sierra-Ayala lacked standing, the district court concluded that Sierra-Ayala was authorized to possess the bag but that the evidence was insufficient to support a depositor-depository relationship between Sierra-Ayala and his cousin.[6] Moreover, even if such a relationship existed, the court concluded that a bailment was not necessarily sufficient to establish a reasonable expectation of privacy. Instead, the court found that Sierra-Ayala "undertook no affirmative precautions to maintain privacy" even though the court assumed, for purposes of

---

[5] As discussed infra, the district court subsequently abandoned this assumption and expressly found that Sierra-Ayala voluntarily displayed the contents of the bag to Sergeant López-Maysonet.

[6] "The depositum contract is a civil law concept, existing in Louisiana as well as Puerto Rico, that has some relationship with the common law concept of bailment." Jewelers Mut. Ins. Co. v. N. Barquet, Inc., 410 F.3d 2, 12 (1st Cir. 2005). A depository assumes a duty of care to the depositor to safeguard the object. Id. at 14.

the order, that Sierra-Ayala's version of the events was accurate.[7]
The court observed that "[t]he record is silent on whether [Sierra-
Ayala] had a subjective expectation that the bag was to remain
free from governmental intrusion." Because the court found that
Sierra-Ayala lacked standing to challenge the discovery of the
drugs, it did not make a credibility determination beyond its
assumption, for purposes of resolving the question of standing,
that Sierra-Ayala's testimony accurately described the situation.

### 4. The District Court's Supplemental Order

After the district court issued its order adopting the
Report and Recommendation with respect to Sierra-Ayala's standing
to challenge the search of the bag, defense counsel sought a
supplemental order on Sierra-Ayala's standing to suppress the gun,
which Sergeant López-Maysonet testified to finding on Sierra-
Ayala's person. The court allowed the parties to address the issue
at a pre-trial status conference. At the conference, defense
counsel argued that Sierra-Ayala's lack of standing to suppress
the contents of the bag was irrelevant to whether he had standing
to challenge the discovery of the gun on his person. Defense
counsel also argued that, even if the court credited Sergeant
López-Maysonet's version of the events, Sierra-Ayala's display of
the bag could not be voluntary under the fruit-of-the-poisonous-

---

[7] Again, according to Sierra-Ayala, he only turned the bag
over to Sergeant López-Maysonet after being ordered to do so.

tree doctrine because Sierra-Ayala was illegally seized when Sergeant López-Maysonet approached.

During the status conference, the district court indicated on multiple occasions that it was crediting Sergeant López-Maysonet's testimony, rather than Sierra-Ayala's, about how the encounter unfolded.[8] After the status conference, the district court issued a supplemental order, which summarized the factual findings the district court had adopted at the status conference:

> [T]he defendant was with a group of individuals who ran away when police officers arrived in the area. The defendant, however, stayed in place. One of the officers (Sergeant López[-Maysonet]) approached the defendant, identifying himself as a police officer. The defendant held open and showed the contents of the bag to the officer, who saw a clear plastic bag that had purple packages in it, which the officer knew was the type of packaging used for heroin. The officer placed the defendant under arrest and frisked him, finding the gun.[9]

The court rejected Sierra-Ayala's argument that he was seized at the time Sergeant López-Maysonet approached, and concluded that, because Sierra-Ayala voluntarily displayed the contents of the bag, the sergeant had probable cause to arrest him. The court concluded that the discovery of the gun on Sierra-Ayala's person

---

[8] Defense counsel objected to the court's finding that Sergeant López-Maysonet's approach to Sierra-Ayala was constitutional.

[9] In the same order, the district court also indicated that it "[wa]s in agreement with the Magistrate Judge's factual analysis."

- 15 -

was therefore a permissible consequence of a constitutional search incident to arrest.

## 5. Trial

At the start of the trial, the government sought to preclude the defense from questioning Sergeant López-Maysonet about the 2015 incident in which he failed to file a timely report about the misconduct of his supervisee, Officer Daniel López García. The government argued that the incident was not relevant under Giglio. Defense counsel countered that the incident was relevant to Sergeant López-Maysonet's truthfulness under Federal Rule of Evidence 608 and his potential bias. Defense counsel also sought to introduce the sergeant's statements from the suppression hearing as a prior inconsistent statement.

The district court ruled that defense counsel could not cross-examine Sergeant López-Maysonet about the incident, noting that "[López-Maysonet] submitted the report. He did it late. That's not . . . [Rule] 608 material." The court also precluded defense counsel from introducing Sergeant López-Maysonet's testimony at the initial suppression hearing as a prior inconsistent statement. The court explained that whether López-Maysonet was "under investigation at the time of the arrest of Mr. Sierra-Ayala" was "not what was asked of [López-Maysonet] . . . . Defense counsel was very specific, and they were referring to a

- 16 -

complaint as a result of a theft or loss of monies during [the] execution of a warrant."

The trial commenced after the resolution of these threshold issues. Sergeant López-Maysonet reiterated his prior testimony that Sierra-Ayala voluntarily displayed the contents of the bag to him. Sergeant López-Maysonet also testified to recovering the holster from Sierra-Ayala's person but acknowledged that he failed to document it in the investigatory report filed after the incident. The jury convicted Sierra-Ayala of the four charged offenses.[10] He was sentenced to a term of seventy-two months of imprisonment. This appeal followed.

## C. Claims on Appeal

Appellant seeks review of the district court's denial of his motion to suppress the drugs and firearm. He argues that the fruit-of-the-poisonous-tree doctrine applies to the evidence seized during his encounter with Sergeant López-Maysonet because the encounter was an unconstitutional seizure. The government responds that Sierra-Ayala was not seized when Sergeant López-Maysonet approached and that he voluntarily displayed the contents of the bag to the sergeant. Alternatively, the government suggests

---

[10] The offenses of conviction were: possession of a firearm in furtherance of a drug trafficking crime; possession with intent to distribute a controlled substance (heroin); possession with intent to distribute a controlled substance (crack cocaine); and possession of a firearm with an obliterated serial number.

that the interactions between Sierra-Ayala and Sergeant López-Maysonset constitute a constitutionally permissible investigatory stop under Terry v. Ohio, 392 U.S. 1 (1968). Moreover, even if the initial stop of Sierra-Ayala was unconstitutional, the government contends that the fruit-of-the-poisonous-tree doctrine does not apply to the items seized because their discovery comported with Fourth Amendment principles.

Appellant also appeals the district court's decision, during his trial, to preclude cross-examination of Sergeant López-Maysonet on certain issues relating to the administrative complaint in which Sergeant López-Maysonet was named. Appellant suggests that cross-examination on this issue is relevant to truthfulness -- i.e., Sergeant López-Maysonet's "dishonest[]" conduct in belatedly filing a report about the incident -- and bias -- i.e., that Sergeant López-Maysonet had an incentive to testify favorably for the government because he was under investigation. Appellant contends that the district court abused its discretion in denying cross-examination and that his inability to adequately impeach Sergeant López-Maysonet's bias and truthfulness caused his trial to be fundamentally unfair.

**II.**

We address appellant's suppression arguments first.

**A. Standard of Review**

We review the district court's factual findings at the suppression hearing for clear error and its legal conclusions de novo.  Rodríguez-Pacheco, 948 F.3d at 6.  We are "especially deferential" to the district court's evaluation of witnesses' credibility, which we will overturn "only if, after reviewing all of the evidence, we have a 'definite and firm conviction that a mistake has been committed.'"  United States v. Jones, 187 F.3d 210, 214 (1st Cir. 1999) (quoting United States v. Rostoff, 164 F.3d 63, 71 (1st Cir. 1999)).  "Indeed, absent objective evidence that contradicts a witness's story or a situation where the story itself is so internally inconsistent or implausible that no reasonable factfinder would credit it, 'the ball game is virtually over' once a district court determines that a key witness is credible."  United States v. Guzmán-Batista, 783 F.3d 930, 937 (1st Cir. 2015) (citation omitted) (quoting Rivera-Gómez v. de Castro, 900 F.2d 1, 4 (1st Cir. 1990)).

**B. The Seizure**

The Fourth Amendment prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV.  Evidence acquired in violation of the Fourth Amendment is subject to the exclusionary rule.  Camacho, 661 F.3d at 724.  But "[n]ot every interaction

- 19 -

between a police officer and a citizen constitutes a seizure triggering Fourth Amendment protections." United States v. Ford, 548 F.3d 1, 4 (1st Cir. 2008); see also Florida v. Royer, 460 U.S. 491, 497-98 (1983) (plurality opinion).  Instead, a seizure occurs where the "totality of the circumstances" shows that officers have "'restrained the liberty of a citizen' through 'physical force or [a] show of authority.'"  Camacho, 661 F.3d at 725 (quoting Terry, 392 U.S. at 19 n.16).  Courts evaluate the "'coercive effect of [an] encounter' by asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'"  Id. (quoting Brendlin v. California, 551 U.S. 249, 255 (2007)).

Here, appellant was clearly seized when Sergeant López-Maysonet approached him at the site on Melilla Street.  Immediately preceding Sergeant López-Maysonet's approach, an unmarked vehicle had pulled up in a yard beside a house.  Three officers exited the vehicle, yelling "police."  The officers chased after six or seven fleeing individuals -- individuals who had not been observed engaging in criminal activity prior to the officers' pursuit. Additional police officers and vehicles arrived at the site as the two pursuing officers ran into the woods.  A reasonable person, observing this show of police authority, would not feel free to leave.  The heavy police presence and rapidity with which officers pursued the fleeing individuals "objectively communicate[d] that

[law enforcement] [wa]s exercising [its] official authority to restrain the individual[s'] liberty of movement." United States v. Fields, 823 F.3d 20, 25 (1st Cir. 2016) (second and fourth alterations in original) (emphasis omitted) (quoting United States v. Cardoza, 129 F.3d 6, 16 (1st Cir. 1997)).

Even where an encounter with law enforcement rises to the level of a seizure, however, the Supreme Court has recognized certain exceptions to the protections of the Fourth Amendment. The government argues that even if Sierra-Ayala was seized when Sergeant López-Maysonet approached him, the Terry exception applies. See 392 U.S. at 30-31. Under Terry, "a police officer may briefly detain an individual for questioning if the officer 'reasonably suspects that the person apprehended is committing or has committed a crime.'" Camacho, 661 F.3d at 726 (quoting Arizona v. Johnson, 555 U.S. 323, 326 (2009)). The reasonable suspicion standard requires "a 'particularized and objective basis' for suspecting the person stopped of criminal activity," id. (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)), that is "both objectively reasonable and 'grounded in specific and articulable facts,'" id. (quoting United States v. Hensley, 469 U.S. 221, 229 (1985)). Critically, "the individual facts, taken in the aggregate," must be "sufficient to trigger a reasonable suspicion that some criminal activity was afoot -- and that the defendant

was involved." United States v. Ruidíaz, 529 F.3d 25, 30 (1st Cir. 2008) (emphasis added).

In arguing that Sergeant López-Maysonet possessed reasonable suspicion to justify a Terry stop of Sierra-Ayala, the government points to three facts: (1) the location of the stop, which Sergeant López-Maysonet described as a "known drug point" based on his training and experience; (2) the fact that several individuals were carrying messenger-style bags, which Sergeant López-Maysonet testified were "used to carry controlled substances and weapons"; and (3) the flight of several individuals upon the arrival of police.

The location of a stop in a "high crime area" may be one factor relevant to the Terry analysis. Illinois v. Wardlow, 528 U.S. 119, 124 (2000); United States v. Wright, 485 F.3d 45, 54 (1st Cir. 2007). But the Supreme Court has made clear that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." Wardlow, 528 U.S. at 124 (emphasis added). Although "unprovoked flight" or "nervous, evasive behavior" may provide reasonable suspicion justifying an investigatory stop, id. at 124; see also United States v. Aitoro, 446 F.3d 246, 252 (1st Cir. 2006), Sierra-Ayala -- unlike the other individuals present -- neither fled nor acted evasively as Sergeant López-Maysonet approached, see

- 22 -

Camacho, 661 F.3d at 726. Nor is Sierra-Ayala's possession of a black messenger-style bag enough to tip the scale toward reasonable suspicion. Even if messenger-style bags are commonly used in drug transactions, as Sergeant López-Maysonet testified, they are also useful for any number of legitimate purposes. Sergeant López-Maysonet did not observe individuals using the bags in a way that a "reasonably prudent and experienced police officer would have recognized . . . as consistent with the consummation of a drug deal." United States v. Rabbia, 699 F.3d 85, 90 (1st Cir. 2012).

The totality of the circumstances here does not provide an "objectively reasonable, particularized basis for suspecting [Sierra-Ayala] of criminal activity." Camacho, 661 F.3d at 726 (emphasis added); see also United States v. Wright, 582 F.3d 199, 220 (1st Cir. 2009) (Lipez, J., dissenting) ("[T]he reasonable suspicion justifying a Terry stop must be more than an 'inchoate and unparticularized suspicion or "hunch,"' and it must be specifically focused on the individual under scrutiny." (citation omitted) (quoting Terry, 392 U.S. at 27)). The most that can be said is that Sierra-Ayala was standing near a known drug point -- close to his parents' home -- while holding a bag that can be used to transport drugs, weapons, gym clothes, or any number of other objects. See Camacho, 661 F.3d at 726 ("'The men were walking normally on a residential sidewalk and displayed no apprehension or nervousness when the officers approached,' and Camacho's

responses to [the officer]'s questions 'were direct and non-evasive.'" (quoting the district court)). He did nothing reasonably suggestive of criminal activity.

## C. The Search and Arrest

Our conclusion that Sergeant López-Maysonet lacked reasonable suspicion to justify the initial seizure of Sierra-Ayala does not end the inquiry. The government argues that an intervening voluntary act -- Sierra-Ayala's display of the contents of the bag to Sergeant López-Maysonet -- provided independent probable cause to arrest Sierra-Ayala, rendering any lack of reasonable suspicion prior to the voluntary act irrelevant to suppression.[11]

Appellant offers two arguments in response. First, appellant contends that the district court clearly erred in concluding that he spontaneously and voluntarily displayed the contents of the bag to Sergeant López-Maysonet, thereby obviating

---

[11] The government also argues that we need not reach the merits of Sierra-Ayala's suppression arguments because Sierra-Ayala lacks standing to challenge the search of the bag. We do not address the standing issue. Unlike Article III standing, Fourth Amendment "standing" is not jurisdictional, and courts may address whether a seizure or search was adequately supported -- by reasonable suspicion or probable cause and exigent circumstances -- before resolving whether a defendant has standing to challenge the search or seizure. Byrd, 138 S. Ct. at 1530-31. The district court's written order concluded that Sierra-Ayala lacked standing to challenge the discovery of the drugs, and denied the motion to suppress on that basis. Subsequently, the district court also made the factual finding that Sierra-Ayala acted voluntarily in displaying the contents of the bag to Sergeant López-Maysonet.

the need for probable cause for a search. Second, appellant argues that even if the district court properly concluded that he acted "voluntarily," suppression of the drugs and the firearm is nevertheless appropriate under the fruit-of-the-poisonous-tree doctrine. We consider these arguments in turn.

## 1. A Voluntary Act

At the suppression hearings, the parties presented opposing testimony on the issue of voluntariness. Sierra-Ayala testified that Sergeant López-Maysonet observed the contents of the bag only because he ordered Sierra-Ayala to turn the bag over. Sierra-Ayala argued then, and argues again on appeal, that Sergeant López-Maysonet's coercive inspection of the bag was a search within the meaning of the Fourth Amendment, to which Sierra-Ayala did not consent. See Royer, 460 U.S. at 497 ("[W]ithout a warrant to search Royer's luggage and in the absence of probable cause and exigent circumstances, the validity of the search depended on Royer's purported consent."). The government, on the other hand, argues that Sierra-Ayala voluntarily showed Sergeant López-Maysonet the contents of the bag, such that López-Maysonet's observation of the bag's contents was not an illegal search under the Fourth Amendment.

Where the government defends the validity of a search based on an individual's consent, the government "has the burden of proving that the necessary consent was obtained and that it was

freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." <u>Royer</u>, 460 U.S. at 497. Sergeant López-Maysonet testified that Sierra-Ayala "freely and voluntarily" showed him the bag, without any prompting. After hearing Sierra-Ayala's competing testimony, the magistrate judge made the factual finding that Sierra-Ayala voluntarily displayed the bag's contents to Sergeant López-Maysonet. The Report and Recommendation identified several factors supporting the magistrate judge's determination that López-Maysonet's testimony on this point was credible.[12] The district court adopted this factual finding in a written order, after a de novo suppression hearing and subsequent status conference that addressed the voluntariness issue.

Although appellant offers several arguments for why the lower court's credibility assessment of the competing testimony on voluntariness was wrong,[13] he does not identify "objective evidence

---

[12] These factors include López-Maysonet's tone and demeanor and the logic and plausibility of his version of the events, as compared to the inconsistencies and implausibilities of Sierra-Ayala's version of events. The magistrate judge specifically found implausible Sierra-Ayala's testimony regarding the prices of the goods he sought to purchase and the "story . . . that he was literally caught holding the bag."

[13] Specifically, Sierra-Ayala argues that the district court overlooked the generally implausible nature of Sergeant López-Maysonet's testimony, the nonsensical logic of Sierra-Ayala's supposedly voluntary action, Sergeant López-Maysonet's evasiveness during testimony, and Sergeant López-Maysonet's disciplinary history.

that contradicts [Sergeant López-Maysonet's] story." Guzmán-Batista, 783 F.3d at 937. Nor was Sergeant López-Maysonet's testimony "so internally inconsistent or implausible that no reasonable factfinder would credit it." Id. Because appellant's evidentiary arguments do not leave us with a "definite and firm conviction" that the district court erred in crediting Sergeant López-Maysonet's testimony, Jones, 187 F.3d at 214 (quoting Rostoff, 164 F.3d at 71), the district court did not clearly err in concluding that Sierra-Ayala displayed the drugs to Sergeant López-Maysonet without prompting from the sergeant. See United States v. Casellas-Toro, 807 F.3d 380, 390 (1st Cir. 2015) (noting that the voluntariness of a consent search is a factual determination for the district court); accord United States v. Coraine, 198 F.3d 306, 308 (1st. Cir. 1999). Upon observing the drugs in the bag due to this voluntary act, Sergeant López-Maysonet acquired probable cause to arrest Sierra-Ayala and to conduct a search of him incident to arrest.

Ordinarily, this conclusion would end our inquiry and warrant affirmance of the district court's order denying Sierra-Ayala's motion to suppress. But because appellant also argues that his "voluntary" act is inextricably linked to the initial unconstitutional seizure that precipitated his display of the bag, we next address whether suppression is warranted under the fruit-of-the-poisonous-tree doctrine.

## 2. Fruit of the Poisonous Tree

The fruit-of-the-poisonous-tree doctrine is an extension of the Fourth Amendment exclusionary rule that requires "indirect fruits" recovered after an initial Fourth Amendment violation to be suppressed if they "bear a sufficiently close relationship to the underlying illegality." Camacho, 661 F.3d at 729 (quoting New York v. Harris, 495 U.S. 14, 19 (1990)). Because the exclusionary rule "is a 'prudential' doctrine" whose "sole purpose . . . is to deter future Fourth Amendment violations," Davis v. United States, 564 U.S. 229, 236-37 (2011) (quoting Pa. Bd. of Prob. & Parole v. Scott, 524 U.S. 357, 363 (1998)),[14] suppression as fruit of the poisonous tree is not appropriate where "the connection between the illegal police conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint,'" Camacho, 661 F.3d at 729 (quoting Segura v. United States, 468 U.S. 796, 805 (1984)). "The notion of the 'dissipation of the taint' attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." United States v. Cordero-Rosario, 786 F.3d 64, 75 (1st Cir. 2015)

---

[14] As the Court emphasized in Davis, "[e]xclusion is 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search." 564 U.S. at 236 (quoting Stone v. Powell, 428 U.S. 465, 486 (1976)).

(quoting Brown v. Illinois, 422 U.S. 590, 609 (1975) (Powell, J., concurring)).

In the context of a "voluntary" confession after an illegal arrest, to which appellant analogizes his situation, courts examine "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct" to determine whether suppression of the statements is warranted under the fruit-of-the-poisonous tree doctrine. Brown, 422 U.S. at 603-04 (citations and footnote omitted). And, of closer relevance to the situation here, we have held that the fruit-of-the-poisonous-tree doctrine may be implicated where an individual's "voluntary" consent to a search of his belongings followed an initial Fourth Amendment violation that "significantly influenced his decision to consent." United States v. Navedo-Colón, 996 F.2d 1337, 1339 (1st Cir. 1993).[15] The "key inquiry" is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Cordero-

_____

[15] Whether the initial illegality "play[ed] a significant role in obtaining appellant's consent" is a factual question for the district court. Navedo-Colón, 996 F.2d at 1339; see also Cordero-Rosario, 786 F.3d at 73, 78 (remanding for the district court to make the factual finding after reversing the holding "that the searches . . . did not violate the Fourth Amendment").

- 29 -

Rosario, 786 F.3d at 75-76 (emphasis added) (quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963)); accord United States v. Delgado-Pérez, 867 F.3d 244, 257-58 (1st Cir. 2017).[16]

Applying these principles, we conclude that the circumstances of this case do not warrant suppression of the evidence recovered from Sierra-Ayala as fruits of the poisonous tree. To start, we recognize that this case differs from the consented-to search at issue in Navedo-Colón, where the district court assumed without deciding that the initial alleged illegality (an illegal x-ray) was unlawful. 996 F.2d at 1338. Here, in contrast, the district court concluded that Sierra-Ayala was not seized, and thus it did not consider the fruit-of-the-poisonous-tree issue. Nevertheless, the district court made factual findings that give us sufficient information to determine whether Sierra-Ayala's display of the bag was "obtained by exploitation of the underlying illegality." See Cordero-Rosario, 786 F.3d at 78 (remanding where "we lack[ed] sufficient information to determine whether [the] consent was obtained by exploitation of the underlying illegality"); Navedo-Colón, 996 F.2d at 1338-39

_____

[16] Although "[h]ow appellant's mind worked at the time -- whether or not the [initial illegality] significantly influenced" his action -- is a factual determination for the district court that we review for clear error, Navedo-Colón, 996 F.2d at 1339, "[i]n determining the outcome under the attenuation doctrine, the court of appeals does not defer to the district court." United States v. Paradis, 351 F.3d 21, 32 (1st Cir. 2003). In other words, our review is de novo.

(holding that although the district court did not "explicitly deny a causal connection between the x-ray and appellant's consent," a "[f]air[] read[ing]" of its opinion "indicates that the court asked, and answered, the correct causal question in deciding whether to suppress evidence of consent").

Even assuming a causal connection between the voluntary display of the bag and the initial illegal seizure effected by the arriving officers' show of authority due to their temporal proximity, the facts found by the district court do not support the conclusion that "the causal link . . . is so tight that the evidence acquired pursuant to that [voluntary act] must be suppressed." Delgado-Pérez, 867 F.3d at 257 (quoting Cordero-Rosario, 786 F.3d at 76); see also United States v. Serrano-Acevedo, 892 F.3d 454, 460 (1st Cir. 2018) (indicating that suppression is not warranted where the causal link between an initial illegality and subsequent consent is "sufficiently attenuated"). Nothing about the behavior of the officers at the scene generally, or Sergeant López-Maysonet's particular actions towards Sierra-Ayala, can be read as "exploit[ing]" the primary illegality, Cordero-Rosario, 786 F.3d at 78, to induce Sierra-Ayala to display the contents of the bag. See United States v. Smith, 919 F.3d 1, 12 (1st Cir. 2019) ("'[T]he purpose and flagrancy of the official misconduct' . . . 'is the most important part of the analysis "because it is tied directly to the rationale

- 31 -

underlying the exclusionary rule, deterrence of police misconduct."'" (first quoting Cordero-Rosario, 786 F.3d at 76; and then quoting United States v. Stark, 499 F.3d 72, 77 (1st Cir. 2007))).

According to Sergeant López-Maysonet's testimony, which the district court credited, Officers Lopez Garcia and Garcia Nieves, upon arriving at the site, exiting their vehicle, and announcing themselves as law enforcement, chased several individuals into the woods as other officers arrived. Sergeant López-Maysonet "was behind Officer [Garcia Nieves] when [he] noticed an individual that remained sitting down on a plastic chair, so [Sergeant López-Maysonet] turned and . . . identified [him]self as a police officer and the individual stood up facing [him], . . . turned to the right and . . . opened [the bag he was holding] and showed [López-Maysonet] the contents." To be sure, the officers' cumulative show of force as they pursued the fleeing individuals contributed to the seizure of Sierra-Ayala. But chasing other fleeing individuals cannot be interpreted as exploiting the illegal seizure to induce the seized individual to surrender evidence. Cf. Wardlow, 528 U.S. at 124 (unprovoked flight may provide reasonable suspicion to investigate fleeing individuals). Nor was turning towards Sierra-Ayala and identifying himself as a police officer while the other officers pursued those in flight flagrant misconduct by Sergeant López-

Maysonet. See Smith, 919 F.3d at 12 (distinguishing the "professional and polite" interactions at issue from the "extreme tactics the Supreme Court [has] deemed coercive").

Any number of scenarios could have followed Sergeant López-Maysonet's identification of himself as law enforcement, including an order from the sergeant to hand over the bag -- which likely would have been deemed to exploit the initial seizure -- but also a notification that Sierra-Ayala was free to go -- which clearly would not. But, as the district court found, nothing exploitative happened: Sergeant López-Maysonet "just identified himself, and [Sierra-Ayala] gave him the bag." These facts render this case quite unlike Camacho, where we suppressed evidence under the fruit-of-the-poisonous-tree doctrine after police officers engaged in aggressive questioning of Camacho after an illegal stop and "[t]he only intervening action by Camacho between the illegal stop and the frisk [that precipitated the discovery of evidence] was removing his hands from his pockets at [an officer]'s direction." 661 F.3d at 729-30. Sierra-Ayala's intervening volitional act, in the absence of exploitative behavior by López-Maysonet, renders the discovery of the drugs sufficiently attenuated so as to dissipate the taint of the initial unlawful seizure. Hence, we affirm the district court's denial of Sierra-Ayala's motion to suppress. See United States v. Rivera, 825 F.3d 59, 64 (1st Cir. 2016) ("[B]ecause of the de novo component to our

- 33 -

review, we can affirm on any ground appearing in the record . . . .").

## III.

We now turn to appellant's appeal of the limitations the district court imposed on the cross-examination of Sergeant López-Maysonet.

### A. Standard of Review

The Confrontation Clause of the Sixth Amendment "guarantees criminal defendants the right to cross-examine those who testify against them." United States v. Jiménez-Bencevi, 788 F.3d 7, 20 (1st Cir. 2015) (quoting United States v. Vega Molina, 407 F.3d 511, 522 (1st Cir. 2005)). But this right is not unlimited. Although it encompasses "the right to cross-examine the government's witness about his bias against the defendant and his motive for testifying," id. at 21 (quoting United States v. Ofray-Campos, 534 F.3d 1, 36 (1st Cir. 2008)), trial judges may circumscribe the extent of cross-examination, within "reasonable limits[,] . . . based on concerns about . . . harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant," id. (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)). Consequently, we review de novo properly preserved challenges to a district court's decision as to whether a defendant had "sufficient leeway to establish a reasonably complete picture of

the witness'[s] veracity, bias, and motivation" despite the limitations on cross-examination. United States v. Sandoval, 6 F.4th 63, 88 (1st Cir. 2021) (quoting Jiménez-Bencevi, 788 F.3d at 21). Provided this initial threshold is met, we review the specific limitations imposed by the district court for abuse of discretion. Jiménez-Bencevi, 788 F.3d at 21.

**B. Discussion**

Appellant does not contend that he was denied a reasonable opportunity to impeach Sergeant López-Maysonet. Instead, appellant argues that the district court abused its discretion by preventing defense counsel from questioning Sergeant López-Maysonet about the disciplinary incident involving Officer López García, and about Sergeant López-Maysonet's testimony about the incident at the suppression hearing. Because appellant objects to a restriction on the manner or scope of cross-examination, our review begins at the second stage of the Confrontation Clause inquiry and we review the restrictions imposed by the court for abuse of discretion. Appellant must show that the limitations on cross-examination were "clearly prejudicial" to establish an abuse of discretion. United States v. Rosario-Pérez, 957 F.3d 277, 297 (1st Cir. 2020) (quoting Ofray-Campos, 534 F.3d at 37). "The ultimate question is whether 'the jury is provided with sufficient information . . . to make a discriminating appraisal of a

- 35 -

witness's motives and bias.'" Id. (quoting United States v. Landrón-Class, 696 F.3d 62, 72 (1st Cir. 2012)).

Under Federal Rule of Evidence 608(b), "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness," but the district court "may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness." The district court precluded questioning about the administrative complaint against Sergeant López-Maysonet because it found neither the fact of the complaint nor López-Maysonet's answers at the suppression hearing probative of his character for truthfulness or for his bias. Even assuming that cross-examination on these issues would be probative of Sergeant López-Maysonet's character for truthfulness or bias, however, the district court's preclusion of questioning was not clearly prejudicial to appellant because defense counsel was able to impeach López-Maysonet's character for truthfulness and bias[17] by questioning him about inconsistencies between his testimony and his incident report.[18]

---

[17] Appellant's theory of Sergeant López-Maysonet's bias is that the existence of the administrative complaint about the late filing of a report gave him an incentive to lie during his testimony so as not to jeopardize his career. But, beyond this speculative assertion, appellant does not identify a connection between the administrative complaint and the sergeant's testimony in this case to support this theory of bias.

[18] Specifically, defense counsel questioned Sergeant López-

See United States v. Fortes, 619 F.2d 108, 118 (1st Cir. 1980) ("The court need not permit unending excursions into each and every matter touching upon veracity if a reasonably complete picture has already been developed.").  Because appellant has not established that the limits on cross-examination were clearly prejudicial, we conclude that the district court did not abuse its discretion.

Affirmed.

Maysonet about why he did not list a holster among the items seized from Sierra-Ayala in the post-arrest inventory report.  Defense counsel also asked Sergeant López-Maysonet about his failure to identify a twenty-five-cent coin in the inventory report.